872 So.2d 434 (2004)
Jimell SHINGLES, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-672.
District Court of Appeal of Florida, Fourth District.
May 12, 2004.
*435 Carey Haughwout, Public Defender, and Dea Abramschmitt, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Linda Harrison, Assistant Attorney General, West Palm Beach, for appellee.
HAZOURI, J.
Jimell Shingles was charged with robbery with a firearm for events occurring on December 4, 2001. Shingles filed a motion to suppress his confession and another *436 to suppress evidence obtained upon a warrantless search of a room he occupied in his grandmother's home. The trial court denied both motions.
Shingles entered a nolo contendere plea reserving his right to appeal the denial of his motions to suppress. The state and the trial court agreed that the motions, if both were reversed, were dispositive of the entire case. In accordance with the negotiated plea, the trial court sentenced Shingles to ten years with a ten-year minimum mandatory pursuant to sections 775.087(2) and (3), Florida Statutes (2001). We reverse the denial of the motions to suppress and remand to the trial court to discharge Shingles.
At the hearing on Shingles's motions to suppress, Detective Charles Howard of the Wilton Manors Police Department testified that he had been called to investigate a robbery that occurred at a store located at 2349 N.W. 9th Avenue. The police had set up an observation sight at 3398 N.W. 23rd Court in Lauderdale Lakes where a car believed to belong to the suspect was located. Howard heard over his police radio that the suspect was getting into a car and starting to drive away. The Broward Sheriff's Office (BSO) effected the traffic stop and took Shingles into custody. Howard received information that Shingles was in custody and that he matched the description given by the victim of the crime.
When Howard arrived on the scene of the traffic stop, Shingles had been formally arrested for armed robbery and was in the back of the BSO patrol car. After speaking with Detective Dicristofalo, Howard decided to take Shingles back to his home at 3398 N.W. 23rd Court. However, prior to going there Howard interrogated Shingles. He told Shingles that he had information that a firearm had been used in the robbery and asked Shingles the whereabouts of the gun. Howard did not read Shingles his Miranda[1] rights before questioning him and, as far as he knew, no one else had read Shingles his Miranda rights prior to his arrival. Shingles denied all knowledge of a robbery.
Shingles was transferred from the BSO patrol car to a Wilton Manors patrol car and taken back to the house the police had been surveilling. Howard again questioned Shingles about the firearm. However, he had still not advised Shingles of his rights under Miranda.[2] Shingles again denied any knowledge of the robbery or the firearm. Howard then asked Shingles for permission to search his bedroom, but Shingles refused.
When Howard could not obtain permission from Shingles to search his room, he exited the patrol car, went up to the house, and obtained permission from Shingles's grandmother to search the bedroom. Howard did not advise the grandmother that Shingles had refused Howard's request to search his room. Howard found a black jacket on Shingles's bed. Upon further search, he found a money order for $500, a firearm inside a case and "some type of bill" with Shingles's name on it in the top middle drawer of Shingles's night stand. Neither the firearm nor the money order were in plain sight. Shingles remained handcuffed in the back of the patrol car parked outside the house while Howard performed the search. Howard claimed that he was prepared to get a search warrant if necessary, but admitted that in order to obtain a search warrant, he would first have to have probable cause. *437 At that point in time, Howard only had information that someone matching the suspect's description had been inside the house, and a vehicle matching the suspect's vehicle was parked across the street from the house. Howard had no information that the firearm or the money order were inside Shingles's room.
Howard took the evidence recovered from Shingles's house to the victim who identified the money order, firearm, and jacket. Later that day, Howard spoke with Shingles at the police station where he was being held. Howard estimated that he talked to Shingles for approximately fifteen minutes. Howard did not read Shingles his Miranda rights prior to this questioning. Howard testified that he told Shingles that he had recovered the gun and money order and asked him why he did it. Howard told Shingles that he did not need Shingles's statement, but he would be more than happy to take one if Shingles wanted to explain himself. Shingles finally agreed to give a taped statement. At no time prior to taking Shingles's taped statement did Howard ever read Shingles his Miranda rights. Nor did Howard obtain a written waiver of rights from Shingles. Howard admitted that he knew that Shingles had never been arrested before. Shingles was finally read his Miranda rights as his taped statement was being taken. During the taped statement, Shingles admitted that he had committed the armed robbery.
Shingles's grandmother, Ms. May Chance, testified that she had lived at 3398 N.W. 23rd Court for sixteen years and Shingles had lived in that bedroom virtually the entire time. Chance said that Shingles shared his bedroom with her son, Timothy, when her son stayed at her home. Timothy had been living there "on and off" for about a year. Chance said that she was able to enter Shingles's bedroom any time she wanted to. Chance also testified that Shingles paid her $50 a week when he was working, but had not paid her recently because he had been out of work. Chance explained that she did consent to the police searching Shingles's room, but when she consented, she was not aware that Shingles had refused to authorize the search.
A trial court's ruling on a motion to suppress is clothed with a presumption of correctness with regard to the trial court's determination of the historical facts. Appellate courts, however, independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendments. See Connor v. State, 803 So.2d 598, 608 (Fla.2001). Therefore, although we must defer to the trial court's factual findings, we must independently determine de novo whether the warrantless search of Shingles's room constituted an illegal search and seizure and whether the taped confession was made willingly and voluntarily.
We first address the issue of the search of Shingles's bedroom. Shingles asserts that his grandmother could not give valid consent to the search of his room because he was present and had refused his consent. The state responds that Shingles's grandmother, as the owner of the house, was authorized to give consent for the search.
The state asserts that the Florida Supreme Court's decision in Preston v. State, 444 So.2d 939 (Fla.1984), sentence vacated on other grounds, 564 So.2d 120 (Fla.1990), supports the trial court's denial of the motion to suppress the evidence. In Preston, the defendant argued that valid consent had not been given by his mother to the warrantless search of his room. During the search, the police found a jacket left in the open and food stamps which *438 were in a garbage can. These items produced incriminating evidence that assisted in proving that Preston was guilty of murdering a night clerk at a convenience store.
Preston's mother had access to her son's room to clean it and Preston did not lock his room or take any other precautions that exhibited an expectation of privacy in the articles left out in the open in the room. The court concluded that he had no reasonable expectation of privacy in the items which the mother would have had access to within the regular scope of her cleaning activities, that is, out in the open and in the garbage can. Id. at 943.
The court in affirming the fifth district's reversal of the trial court's granting of the motion to suppress quoted with approval from the district court's opinion:
The mother here had access for purposes of doing laundry. The jacket, an article of clothing, was left out in the open. The food stamps were found in a wastebasket, another area over which the mother had access. In addition, there is no reasonable expectation of privacy in regard to articles thrown into the garbage or abandoned. This was not a closet or a bureau drawer, and we respectfully disagree with the trial court.
Id.
In citing to Preston, the state relies on the facts that indicate that Shingles's grandmother had common authority to permit the search. The state totally disregards Shingles's presence at the scene and his refusal to consent to the search and disregards the fact that in Preston, the evidence seized was not in a closet or bureau drawer but out in the open with some of the evidence thrown into the garbage or abandoned. Further, the state fails to distinguish the holding in Silva v. State, 344 So.2d 559 (Fla.1977), wherein the supreme court held:
It is only reasonable that the person whose property is the object of a search should have controlling authority to refuse consent. His rights are personal to him and derive from the United States Constitution. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Though a joint occupant should have authority to consent to a search of jointly held premises if the other party is unavailable, a present, objecting party should not have his constitutional rights ignored because of a leasehold or other property interest shared with another. This is particularly true where the police are aware that the person objecting is the one whose constitutional rights are at stake.
Id. at 562-63.
In the instant case, Shingles was a joint occupant whose constitutional rights were at stake. He was not unavailable, but was present and refused to consent to the search. Therefore, the warrantless search was illegal. See Pinyan v. State, 523 So.2d 718, 721 (Fla. 1st DCA 1988) (a joint occupant or one sharing dominion and control over the premises, may provide consent only if the other party is not present); see also Lawton v. State, 320 So.2d 463 (Fla. 2d DCA 1975) (assuming estranged wife had sufficient control over the premises as to authorize her consent to a search, the search cannot stand because the estranged husband was physically present on the premises and objected to the search); Padron v. State, 328 So.2d 216 (Fla. 4th DCA 1976) (assuming a sixteen-year-old child shared common authority with his father over the premises of a common dwelling place, where the father was present and objected to the search, the son had no authority to override that objection).
The only case in Florida that directly holds that a search of a person's room, *439 within a household owned by another, does not constitute an illegal search and seizure, even though the person whose room is searched is both present and objects to the search is State v. S.B., 758 So.2d 1253 (Fla. 4th DCA 2000). The facts in S.B. are distinguishable from the instant case.
In S.B., the father of S.B., after being informed by the police that S.B. was selling drugs and weapons, consented to the police searching S.B.'s bedroom. Because S.B. objected to the search the trial court granted S.B.'s motion to suppress. This court held that by virtue of his parental authority, the father's consent overrides the juvenile's objection and we reversed the granting of the motion to suppress. In distinguishing the cases of Silva and United States v. Matlock, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (the consent of one who possesses common authority over premises or effects is valid as against the absent nonconsenting person with whom the authority is shared), this court stated:
Those cases, however, did not involve the issue of whether a parent could validly consent to a search where the object of the search was the room of a minor who was objecting. Although this appears to be a question of first impression in Florida, the majority of courts which have considered the issue have held that a parent can consent to a search of a juvenile's room even though the juvenile objects ... [W]e analyze [the present case] as containing two issues: (1) whether the non-resident father, by virtue of his ownership and authority to enter the home, could consent to a search of the home, and (2) whether the search of the minor son's bedroom over the son's objection was valid based on the father's consent. According to the transcript, the trial court concluded that the father, under these specific facts, generally had authority to consent to a search of the home. We agree. We disagree with the trial court that the objection by the son precluded a search of the son's bedroom and follow those cases from other jurisdictions upholding the search on the basis of parental relationship.
S.B., 758 So.2d at 1254-55.
In the instant case, Shingles was not a minor. Although he was residing in a room in his grandmother's house, there is no "parental relationship" of the type envisioned in S.B. Furthermore, Shingles, according to the testimony of the grandmother, periodically had paid $50 a month rent for use of the bedroom.
As an alternative basis to affirm the trial court's denial of the motion to suppress the evidence, the state argues that the trial court denied the motion to suppress the evidence on the additional ground of inevitable discovery,[3] i.e., Howard was prepared to obtain a search warrant and therefore, even if the warrantless search was illegal, the trial court's denial of the motion to suppress should be affirmed. We disagree.
Howard had an insufficient factual basis to establish the necessary probable cause to obtain a valid search warrant of the home and specifically, Shingles's room. At the time of Shingles's arrest, he was a suspect who had not been positively identified by the victim. His only other connection to the robbery was that he was seen getting something out of the getaway car that was parked across the street from his grandmother's house. Additionally, Howard *440 testified that he had no idea where the firearm might be located.
We now turn our attention to the trial court's denial of the motion to suppress Shingles's confession. Shingles argues that the statements should be suppressed as fruit of the poisonous tree, i.e., a result of his being presented with the evidence found in the house after the illegal search. We agree.
We find the third district's opinion in Smith v. State, 465 So.2d 603 (Fla. 3d DCA 1985), to be persuasive on this issue. The facts of Smith are strikingly similar except for the fact that the crime involved in Smith was a homicide. Following the shooting death of Smith's niece's boyfriend, Smith was taken to the police station and questioned regarding his involvement in the incident. Smith denied shooting the victim and refused permission to conduct a warrantless search of his home. After Smith's refusal, and while he was undergoing questioning at the police station, a detective spoke to the sister with whom Smith lived and obtained her consent to search the premises. During the course of the search, the police discovered a gun, rubber gloves, and a shirt in the attic of the house. Several days later, Smith was again taken to the police station for questioning. When confronted with the fact that the gun believed to have killed the victim had been found in the attic of his home, Smith confessed to the homicide. Smith filed a motion to suppress the evidence seized from the attic and to suppress the confession. The trial court denied the motion and the case proceeded to trial, culminating in a jury verdict of guilty.
Smith argued that the trial court erred in denying his motion to suppress the physical evidence and the confession obtained as a direct result of an unlawful search. Emphasizing that the search of the home in which he lived with his sister focused on his property, he maintained that his refusal of permission to search invalidated his sister's subsequent consent. Thus, he argued that the warrantless search was unreasonable, and the evidence and confession were unlawfully obtained. The third district agreed and reversed. In arriving at this conclusion the third district stated:
Although joint occupants may consent to a search of their premises, United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Silva v. State, 344 So.2d 559 (Fla.1977), where consent is refused by the party against whom the search is directed, any subsequent consent by the other joint occupant is invalid. Silva. See Pugh v. State, 444 So.2d 1052 (Fla. 1st DCA 1984); Lawton v. State, 320 So.2d 463 (Fla. 2d DCA 1975).
Id. at 604.
The third district concluded the search was unlawful and the evidence obtained as a result of the search must be suppressed. It also held that Smith's confession, obtained when the police confronted him with the fact that they had conducted a warrantless search despite his objection and had seized incriminating evidence, must also be suppressed. See Wong Sun v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); French v. State, 198 So.2d 668 (Fla. 3d DCA 1967).
The state argues that this court's decision in Jetmore v. State, 275 So.2d 61 (Fla. 4th DCA 1973), supports the argument that the statement given by Shingles was not the fruit of a poisonous tree because the trial court could have reasonably decided that the statement was the result of a voluntary exercise of free will. In Jetmore, the trial court ruled that Jetmore had been subjected to an illegal arrest and tangible evidence obtained pursuant to the illegal arrest was suppressed. Jetmore also sought to suppress his confession because *441 the arrest and search were illegal. At the suppression hearing concerning the confession, Jetmore testified that shortly after his arrest, he was taken to the police station where he was advised in detail of his Miranda rights and understood his rights, having been given them on a prior occasion and that he confessed because he had come to the conclusion that the police had sufficient evidence to convict him anyway. Jetmore, 275 So.2d at 63.
In affirming the denial of the motion to suppress Jetmore's confession, our court concluded:
The present statement, although given only forty-five minutes after the arrest, was quite obviously given freely and voluntarily and after a full and complete Miranda warning which the defendant expressly stated he understood. Thus it seems to us that the trial court had the factual basis before it from which it could reasonably have found that defendant's statement was the result of a voluntary exercise of free will and independent of the illegal search and seizure.
Id. at 64.
The facts in Jetmore are distinguishable from the facts in the instant case. Shingles was convinced to give an incriminating statement only after Howard confronted him with the evidence. Prior to that, he had denied any involvement. When the tape began running, only then was he advised of his Miranda rights. We find the third district's opinion in Smith to be on point in light of the facts of the instant case. We, therefore, reverse the trial court's denial of both motions to suppress, and we remand to the trial court to discharge Shingles.
STONE and STEVENSON, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] At the hearing, Howard acknowledged each time Shingles was interrogated, he was under arrest and in custody.
[3] The purpose of the inevitable discovery exception to the exclusionary rule is to protect evidence obtained illegally where a concurrent legal investigation would assuredly have procured the identical evidence. See State v. LeCroy, 435 So.2d 354 (Fla. 4th DCA 1983).