PER CURIAM.
Casey Anthony appeals her convictions for four counts of providing false information to a law enforcement officer during a missing person investigation in -violation of section 837.055, Florida Statutes (2008). These charges arose from statements Appellant made to Detective Yuri Melich on July 16, 2008 during an investigation into the disappearance of Appellant’s young daughter, Caylee Anthony. Appellant ar *1114 gues that these convictions should be reversed because: (1) the trial court should have granted her motion to suppress statements made to law enforcement officers prior to Appellant having been apprised of her Miranda[1] rights; (2) her multiple convictions violated the prohibition against double jeopardy; and (3) section 837.055 is unconstitutionally vague. We reject Appellant’s first and third arguments, but conclude that double jeopardy principles require that two of her four misdemeanor convictions be set aside.
On the evening of July 15, 2008, law enforcement officers arrived at the residence of Appellant’s parents, George and Cindy Anthony, in response to three 9-1-1 calls placed by Cindy Anthony. In the first two calls, Cindy Anthony requested police assistance in recovering a vehicle and money allegedly stolen by Appellant. In the third 9-1-1 call, Cindy Anthony reported that her granddaughter, Caylee, had been missing for approximately thirty days. Cindy Anthony testified that she made these phone calls because Appellant would not tell her where Caylee was.
When the officers arrived, they separated the family members according to their standard procedure and obtained statements regarding the missing child. Appellant appeared to be cooperating with the officers and provided information freely and voluntarily. She informed the officers that she had last seen Caylee when she dropped her off at the apartment of her nanny, Zenaida Fernandez-Gonzalez, on June 9, 2008. Appellant informed the officers that Gonzalez lived at the Sawgrass Apartments in Orlando, but she could not remember the apartment number.
Appellant agreed to go with Deputy Acevedo to the Sawgrass Apartments to show her exactly where she had last seen her daughter. She sat in the back of Deputy Acevedo’s vehicle with the partition open so that she could communicate with her. After indicating to Deputy Acevedo the particular apartment where she had purportedly left Caylee, Appellant was driven back to her home where she gave law enforcement officers a written statement. The statement was read into evidence at trial and provided as follows:
Monday June 9th, 2008, between 9 a.m. and 1 p.m., I, Casey Anthony, took my daughter, Caylee Marie Anthony, to her nanny’s apartment. Caylee will be three years old on August 9th, 2008. She was born on August 9, 2005. Cay-lee is about three feet tall, white female with shoulder-length, light brown hair. She has dark hazel eyes (brown/green), and a small birthmark on her left shoulder. On the day of her disappearance, Caylee was wearing a pink shirt with jean shorts, white sneakers and her hair was pulled back in a ponytail.
On Monday, June 9, 2008, between 9 a.m. and 1 p.m., I took Caylee to the Sawgrass Apartments located on Conway Road. Caylee’s nanny, Zenaida Fernandez-Gonzalez, has watched her for the past year and a half to two years. Zenaida is 25 years old and is from New York. She is roughly five-foot seven-inches tall, 140 pounds. She has dark brown curly hair and brown eyes. Ze-naida’s birthday is in September.
I met Zenaida through a mutual friend, Jeffrey Michael Hopkins. She has watched his son Zachary Hopkins for six months to a year. I met Zenaida in 2004 around Christmas. On the date listed above, June 9, 2008, after dropping Caylee off at Zenaida’s apartment, I proceeded to head to my place of employment at Universal Studios Orlan *1115 do. I have worked at Universal for over four years since June of 2004.
I left work around 5 p.m. and went back to the apartment to pick up my daughter; however, after reaching the apartment, I realized that neither Zenaida or Caylee nor either of her two roommates was home.
I had briefly met Raquel Farrell and Jennifer Rosa on various occasions after calling Zenaida to see where she and Caylee were and when they were coming home. I waited outside of the apartment.
I had called Zenaida earlier that morning prior to bringing Caylee over for the afternoon. When I called her that afternoon, her phone was no longer in service.
Two hours passed, and around 7 p.m., I left the apartment and headed to familiar places that Zenaida would go with Caylee. One of Caylee’s favorite places is Jay Blanchard Park. I spent the rest of the evening — correction—rest of that evening pacing and worrying that one of the few places I felt, quote, at home, unquote, my boyfriend Anthony Lazza-ro’s apartment.
For the past four weeks since Caylee’s disappearance, I have stayed at Anthony’s apartment in Sutton Place. I have spent every day since Monday, June 9, 2008, looking for my daughter. I have lied and stolen from my friends and family to do whatever I could by any means to find my daughter.
I have avoided calling the police or even notifying my own family out of fear. I have been and still am afraid of what has or may happen to Caylee. I have not had any contact with Zenaida since Thursday, June 12, 2008. I received a quick call from Zenaida.
Not once have I been able to ask her for my daughter or gain any information on where I can find her. Every day I have gone to malls, parks, anyplace I could remember Zenaida taking Caylee. I have gone out and tried to find any information about Caylee or Zenaida whether by going to a popular bar or restaurant.
I have contacted Jeff Hopkins on several occasions to see if he had heard from or seen Zenaida. Jeff currently lives in Jacksonville, Florida.
On Tuesday, July 15th, 2008, around 12 p.m., I received a phone call from my daughter Caylee. Today was the first day I have heard her voice in over four weeks. I’m afraid of what Caylee is going through. After 81 days, I know that the only thing that matters is getting my daughter back.
With many and all attempts to contact Zenaida and within the one short conversation on June 12th, 2008,1 was never able to check on the status or well-being of my daughter. Zenaida never made an attempt to explain why Caylee is no longer in Orlando or if she is ever going to bring her home.
At some point after Appellant had given her written statement, Cindy Anthony approached Deputy Eberlin and presented him with documents purportedly demonstrating that Appellant had fraudulently used Cindy Anthony’s credit card. Because Deputy Eberlin believed Cindy Anthony’s allegations regarding the fraudulent credit card charges, he handcuffed Appellant and put her in his patrol car. Shortly thereafter, supervising officer Sergeant Hosey noticed that Appellant was in handcuffs and instructed that the handcuffs be removed because the focus of the law enforcement investigation was the possible kidnapping of Caylee and not fraud allegations against Appellant.
*1116 After the removal of the handcuffs, Appellant reentered the Anthony residence and was permitted to move about freely. Detective Melich arrived at the Anthony residence at 8:30 a.m. (July 16th) — approximately an hour after the handcuffs were removed. At about 4:10 a.m., Detective Melich spoke with Appellant in the spare bedroom of the residence, with the door open. The interview was recorded with Appellant’s consent and admitted into evidence at trial. During this interview, Appellant reaffirmed her prior written statement and added that she had also disclosed Caylee’s disappearance to Juliette Lewis and Jeffrey Hopkins, former Universal Studios employees.
Following her interview with Detective Melich at the Anthony residence, Appellant agreed to show Detective Melich where she had dropped Caylee off on June 8, 2008, as well as Gonzalez’s former residences. Appellant rode with Detective Melich in the front passenger seat of his unmarked police vehicle for approximately one hour, directing him to the Sawgrass Apartments and the other two locations where she claimed Gonzalez had lived. At no point during the car ride or interview did Detective Melich advise Appellant that she was under arrest, nor did Appellant suggest that she wished to terminate the encounter. Rather, Appellant appeared to be cooperative and indicated that she wanted Detective Melich’s help finding Caylee. Detective Melich returned Appellant to her family’s home and left around 6:45 a.m. At the time Appellant was dropped off at the Anthony residence, there were no officers present.
Detective Melich then began investigating the information Appellant had provided him and found it to be false. Later on July 16th, he called Appellant and requested that she come to Universal Studios. Two other officers picked Appellant up at her home and drove her to Universal Studios — approximately a thirty minute drive from the Anthony residence. Appellant and the two officers met Detective Melich at the employee entrance. Appellant was not in handcuffs and was not being touched or surrounded by the officers. At the security gate, Appellant adamantly claimed that she worked at Universal Studios, but did not have an employee identification card with her, nor did her alleged manager appear in Universal Studios’ database. Unable to confirm her employment status, Appellant indicated that she could show the officers where she worked. She led the officers into a building in an employees-only area of Universal Studios and walked down a hallway before she stopped and admitted that she did not work at Universal Studios.
Detective Melich then advised Appellant that he wanted to speak with her further, and they entered a small conference room in the building. During this second interview, Anthony was repeatedly confronted with her prior lies, although a primary focus of the interview was to obtain information to help locate the missing child. Indeed, Appellant acknowledged during the interview that she was there voluntarily for the purpose of helping the officers locate Caylee. Appellant admitted to Detective Melich that she had lied about working at Universal Studios and about Gonzalez’s address, but maintained that she had left Caylee with Gonzalez on June 9, 2008, and that she had spoken with Caylee on the phone on July 15, 2008. Appellant was later taken to the sheriffs office where she was arrested for child neglect and for providing false information to law enforcement. At the sheriffs office, Appellant was advised of her Miranda rights for the first time.
When Caylee’s remains were later discovered near the Anthony family home on *1117 December 11, 2008, Appellant was charged with murder. She was subsequently indicted for first-degree murder, aggravated child abuse, aggravated manslaughter of a child, and four counts of providing false information to a law enforcement officer. As to the last four counts, Appellant was charged with knowingly and willfully giving the following false information to Detective Melich:
Count 4: Appellant was employed at Universal Studios Orlando during the year 2008;
Count 5: Appellant left the child, Caylee Marie Anthony, at the Sawgrass Apartments, 2863 South Conway Road, Apt. 210, Orlando, Florida, with a person identified as Zenaida Fernandez-Gonzalez on June 9, 2008 or any subsequent date;
Count 6: Appellant informed persons identified as Jeffrey Michael Hopkins and Juliette Lewis, former Universal Studios Orlando employees, of the disappearance of the child, Caylee Marie Anthony, between June 9, 2008 and July 16, 2008;
Count 7: Appellant received a phone call from the child, Caylee Marie Anthony, on July 15, 2008 at approximately 12:00 p.m.
Appellant sought to suppress her statements made to law enforcement officers on the grounds that such statements were the product of custodial interrogation and were obtained prior to Appellant being informed of her Miranda rights. After a lengthy evidentiary hearing, the trial court entered a detailed order denying the motion. The case proceeded to trial with the jury ultimately finding Appellant guilty of the four counts of providing false information,[2] but not guilty of the other three charges. Appellant’s post-trial motion to vacate three of the four misdemeanor convictions based on double jeopardy was denied and this appeal followed.
We conclude that the trial court did not err in denying Appellant’s motion to suppress. Miranda warnings are only required when a defendant is in custody and subjected to interrogation. Davis v. State, 698 So.2d 1182, 1188 (Fla.1997). In determining whether a defendant is in custody for purposes of Miranda, the primary inquiry is whether a reasonable person in the defendant’s position would believe that his or her freedom was curtailed to a degree associated with actual arrest. Mansfield v. State, 758 So.2d 636, 644 (Fla.2000); Bedoya v. State, 779 So.2d 574, 579 (Fla. 5th DCA 2001). The Florida Supreme Court has stated there are four factors that guide the determination of whether a suspect is in custody: (1) the manner in which law enforcement officers summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; and (4) whether the suspect is informed that he or she is free to leave. Ramirez v. State, 739 So.2d 568, 574 (Fla.1999).
We have no difficulty concluding that Appellant was not in custody at the time she gave a recorded statement to Detective Melich at the Anthony residence on the morning of July 16, 2008. First, Anthony was not summoned by law enforcement officers for questioning; rather, the officers went to the Anthony residence in response to 9-1-1 calls. Second, the interview took place in a spare bedroom at the Anthony residence, not in the potentially coercive environment of a sheriffs *1118 office. See Duddles v. State, 845 So.2d 939, 941 (Fla. 5th DCA 2008) (fact that interrogation occurred inside accused’s house, into which police were invited, indicates that interview was non-custodial). Third, Appellant was considered a witness in a kidnapping case, rather than a suspect and, thus, the purpose of the interview was to obtain information regarding the alleged kidnapping. There was no “confronting” Appellant with evidence of her guilt. Fourth, although Appellant was not informed of whether she was free to leave, the evidence reflects that the door to the spare room utilized for the interview was left open and that Appellant was not restrained in any way from moving about the residence. In summary, all the Ramirez factors weigh heavily in favor of the State.
Appellant argues that because she was briefly handcuffed and arrested on the unrelated grand theftyfraud charges, she must be deemed to have been in custody at the time of her subsequent interview. We reject this argument. As the trial court properly found, because Appellant was released from the handcuffs and voluntarily remained to answer Detective Melich’s questions, any causal link between her arrest and her subsequent statements had been broken. See, e.g., Sanchez-Velasco v. State, 570 So.2d 908 (Fla.1990) (finding by trial court that defendant who was later charged with first-degree murder voluntarily entered police car, even though he had initially been arrested for grand larceny but was released when police discovered they had insufficient grounds to arrest him on that charge, was supported by competent evidence, to-wit: that after police released defendant, he was not told to remain, but rather walked unrestrained to side of the road and sat down for approximately ten minutes, and then in response to a request by one of the investigating officers, defendant agreed to discuss the murder); Parks v. State, 644 So.2d 106 (Fla. 4th DCA 1994) (even if police lacked probable cause for arrest of defendant on unrelated charge, fact that defendant was released from custody and voluntarily remained to answer questions broke causal link between arrest and his making of incriminating statements to police).
The interview at Universal Studios poses a closer question. Although the evidence is clear that Appellant voluntarily accompanied officers to Universal Studios, the nature of the interview was significantly different than the interview that had taken place at the Anthony home. During this latter interview, Appellant was confronted with evidence of her numerous lies and the interview took place in a small office with the door closed. (Appellant was advised by Detective Melich that the door was closed “for privacy.”) However, the fact that the interview took place in a small office with the door closed does not compel the conclusion that Appellant was in custody. See, e.g., Meredith v. State, 964 So.2d 247, 251 (Fla. 4th DCA 2007) (“That the interrogation occurred in the inherently coercive environment of the sheriffs office did not transform the otherwise non-custodial interrogation into a custodial one.”).
The trial court found that while the officers were frustrated with Appellant for leading them on a “wild goose chase,” the overall tone of the conversation was not accusatorial and the officers did not speak to Appellant in an intimidating manner. Significantly, Appellant confirmed on more than one occasion during the interview that she was there voluntarily for the purpose of helping the officers locate her missing daughter. After consideration of the Ramirez factors, we conclude that a reasonable person in Appellant’s position would not believe “that his or her freedom *1119 was curtailed to a degree associated with actual arrest.”
Appellant next argues that double jeopardy principles preclude her from being convicted for more than a single violation of section 887.055, because her various false statements to law enforcement officers constituted a single offense. The State takes the position that each of Appellant’s false statements constituted a separate offense and, therefore, no double jeopardy violation occurred. We reject both parties’ arguments and conclude that under the facts of this case, Appellant can properly be convicted of two counts of providing false information to a law enforcement officer during a missing person investigation.[3]
Section 837.055 provides:
False information to law enforcement during investigation.—
Whoever knowingly and willfully gives false information to a law enforcement officer who is conducting a missing person investigation ... with the intent to mislead the officer or impede the investigation commits a misdemeanor of the first degree....
All four of the false statements were made by Appellant in her interview with Detective Melich at the Anthony residence. Two of the false statements (Counts 5 and 7), were repeated to Detective Melich in the later interview at Universal Studios.
Both the United States and Florida Constitutions contain “double jeopardy” clauses prohibiting multiple prosecutions, convictions, and punishments for the same criminal offense.[4] Valdes v. State, 3 So.3d 1067, 1069 (Fla.2009). However, these constitutional clauses do not prohibit multiple punishments for different offenses arising out of the same episode as long as the Legislature intended to authorize separate punishments. Id.
Initially, we reject Appellant’s argument that all of the false statements were made during a single criminal episode. Appellant gave false information to Detective Melich during two separate interviews that took place several hours apart. Where there is a sufficient temporal break between two alleged criminal acts so as to have allowed a defendant time to pause, reflect, and form a new criminal intent, a separate criminal episode will be found to have occurred. Cabrera v. State, 884 So.2d 482, 484 (Fla. 5th DCA 2004); see Hayes v. State, 803 So.2d 695, 704 (Fla.2001) (courts should look to whether there was separation of time, place, or circumstances between initial armed robbery and subsequent theft of same victim’s property to determine whether there are distinct and independent criminal acts or whether there was one continuous criminal act with single criminal intent). In light of the significant temporal break between Appellant’s two interviews with Detective Melich, we determine that each interview in which false information was given (or repeated) constituted a separate criminal episode.
However, we also find the State’s argument that each false statement constituted a separate crime to be flawed. Sec *1120 tion 837.055 speaks in terms of “false information,” not “false statements.” The term “information” can encompass one or many statements of fact. See Merriam Webster’s Collegiate Dictionary 599 (10th ed.) (listing “facts” as a synonym for “information”). Based on the wording of section 837.055, we cannot conclude that the Legislature intended to authorize separate punishment for each false statement made during a single interview.[5]
Furthermore, in attempting to interpret whether the Legislature intended to authorize separate punishments for each false statement given during an interview with a law enforcement officer conducting a missing person investigation, we are also bound by the rule of construction that any ambiguity must be resolved in favor of the defendant. See § 775.021(1), Fla. Stat. (2008) (“The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.”); Grappin v. State, 450 So.2d 480, 481 (Fla.1984) (where legislature does not establish allowable unit of prosecution with clarity, ambiguity must be resolved in accused’s favor). Based on the aforesaid analysis, we determine that the trial court should have vacated two of Appellant’s convictions.
We find no merit to Appellant’s final argument challenging the constitutionality of section 837.055.
AFFIRMED, in part; REVERSED, in part; and REMANDED for the vacating of two of Appellant’s convictions in accordance with this opinion.
ORFINGER, C.J., TORPY and EVANDER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. At trial, all of the statements referenced in Counts 4 through 7 were proven to be false. On appeal, Appellant does not challenge the sufficiency of the State’s evidence.

. Our standard of review is de novo. See Pizzo v. State, 945 So.2d 1203, 1206 (Fla.2006) (“A double jeopardy claim based upon undisputed facts presents a pure question of law and is reviewed de novo.”).

. The Fifth Amendment to the United States Constitution provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb.” U.S. Const. Amend. V. Article 1, section 9, of the Florida Constitution provides in pertinent part: "No person shall ... be twice put in jeopardy for the same offense.” Art. I, § 9, Fla. Const.

. By contrast, Florida’s perjury statutes speak in terms of "false statement" and, thereby, reflect an intent to punish each false statement as a separate crime. Section 837.02, Florida Statutes (2008), provides:
Perjury in official proceedings.—
(1) Except as provided in subsection (2), whoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding in regard to any material matter, commits a felony of the third degree....
(2) Whoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding that relates to the prosecution of a capital felony, commits a felony of the second degree. ...
(3) Knowledge of the materiality of the statement is not an element of the crime of perjury under subsection (1) or subsection (2), and the defendant’s mistaken belief that the statement was not material is not a defense.
Similarly, section 837.012, Florida Statutes (2008), states:
Perjury when not in an official proceeding.—
(1) Whoever makes a false statement, which he or she does not believe to be true, under oath, not in an official proceeding, in regard to any material matter shall be guilty of a misdemeanor of the first degree ....
(2) Knowledge of the materiality of the statement is not an element of this crime, and the defendant’s mistaken belief that his or her statement was not material is not a defense.