GROSS, J.
D’Andre Bannister timely appeals his convictions for second degree murder, aggravated child abuse, and kidnapping a person under thirteen years of age. This ease involves the substantial, and eventually fatal, injuries Bannister’s four-year-old stepson sustained while under Bannister’s exclusive supervision. At trial, Bannister contended that the victim’s injuries were the result of an unfortunate fall from a tall mango tree. To combat this theory, the State presented the testimony of medical and forensic experts, all of whom opined that, given the extent of the victim’s inju *271 ries, they were inconsistent with falling from a tree, and more likely the result of repeated exposure to blunt force trauma.
We write primarily to address Bannister’s argument that the trial court erred in denying his motion to suppress the statement he made to detectives. We hold that Bannister was not in “custody” at the time he gave a statement, so the State was not obligated to read him his Miranda warnings. We also reject Bannister’s contentions that the court erred by failing to (1) instruct the jury that it could receive a read-back of certain trial testimony and (2) grant a judgment of acquittal because the State failed to negate every reasonable hypothesis of innocence.

The State’s Case

At trial, the victim’s mother, Pameka McNeal, testified that at the time of the incident, she was married to Bannister and lived with him in a home along with their two biological children and McNeal’s four-year-old son from a previous relationship, the victim. McNeal assumed the role of the “bread-winner,” working full-time to support the family, while Bannister stayed at home to care for the children.
On the morning of August 7, 2002, when McNeal left home to go to work, nothing appeared to be amiss and all three children were acting normally. When McNeal returned home at lunchtime, all three children greeted her before moving to the kitchen table where they customarily ate their meals. At the time, all of the kitchen chairs were intact.
After leaving work in the late afternoon, McNeal arrived home to find Bannister “cleaning or washing dishes” while the couple’s two biological children played in the living room; their youngest son was using his toy broom to sweep the house. McNeal also observed the victim sleeping in his bedroom. Given the child’s age, she did not find that to be unusual.
After perusing the house, McNeal braided her daughter’s hair for a while before again checking on the victim. This time, upon turning on the lights, McNeal noticed the victim had a big “knot” on his héad, a “cut on his eye,” and blood coming from his mouth. Recognizing the apparent severity of the injuries, McNeal tried to wake the victim, but received no response.
McNeal grabbed the home phone and tried to call an ambulance. Bannister stopped her by snatching the phone and unplugging it from the wall. Panicked, McNeal tried to call the hospital from her cell phone. Bannister again blocked her efforts, this time forcibly taking her cell phone and removing its battery. As McNeal wailed over her son’s condition, Bannister turned his radio louder, attempting to drown out McNeal’s cries. He insisted the victim would eventually wake up and that authorities should not get involved, since DCF had interfered with their lives two years before.
Without the ability to seek help, McNeal confronted Bannister about what had happened to her son. To this, Bannister pointed to a cabbage palm tree in the front yard and explained that the victim fell from the tree, came inside to ask for a glass of water, and indicated that he wanted to lie down. McNeal was skeptical of this story, since the cabbage palm tree was only about five-to-six feet tall and her son was the type to cry loudly had he seriously injured himself. At that point, Bannister did not mention the forty-to-fifty foot mango tree with numerous branches located in the backyard.
Desperate, McNeal carried the victim from his bed to the shower, where she hoped the running water would awaken him. When the attempt failed, McNeal removed the victim from the shower, dressed him, and tried to flee with him in *272 her arms. Bannister blocked her path, trapping her with her son in the bedroom.
With the victim beginning to turn blue, Bannister, in a last ditch effort, waved fingernail polish and rubbing alcohol under the victim’s nose, but to no avail. Conceding defeat, Bannister finally decided to change his clothes and drive the family to the hospital.
Upon arriving, Bannister dropped McNeal and the victim at the hospital entrance before driving away with the other children, purportedly to take them to his brother’s house. Recognizing that the victim was in a dire stage of distress and gasping for air, nurses immediately placed him in the intensive care unit. When asked what happened, McNeal explained to the doctors how Bannister told her the victim had fallen from a tree.

The Extent of the Victim’s Injuries

An ER pediatric nurse testified that when she and a team of nurses secured the victim, he was lifeless and unusually limp. The nurse noticed “numerous ... fairly fresh” bruises along his front side, chest, legs and hips, along with “numerous marks all over his back.” Given the number and extent of the injuries, the nurse believed that they “were inconsistent with a fall” from a tree, particularly since some of the “red and deep purple marks” appeared to resemble “impressions that were consistent with a large handprint.”
After hooking the victim up to a heart monitor, EKG, and ventilator, the nurses noted abrasions all over the victim’s abdomen and legs, the majority of which appeared fresh. In addition, a catheter revealed that blood was pooling in the victim’s bladder, indicating that he was suffering from an internal injury.
Dr. Roman Pena, a “pediatric intensivist,” testified that when he saw the victim, he immediately noticed “multiple bruises” along the victim’s body “consistent with getting hit with a fist” or “a hard object.” Upon seeing inaction in the victim’s pupils after shining a light in his eyes, it became clear that the victim was suffering from intense swelling of the brain and/or a lack of brain stem activity, potentially exacerbated by “acidosis” caused by a later-discovered pancreas injury.
Based on his evaluation, Dr. Pena opined that the victim’s injuries were not “consistent with a fall from a tree,” and were instead more likely the result of violent child abuse. While Dr. Pena conceded that falling from a forty-foot mango tree and hitting numerous branches “could have caused trauma anywhere,” he did not see how a four-year-old could have climbed such a large tree. Furthermore, had the child fallen from the mango tree, Dr. Pena opined that he would have sustained far more abrasions and broken bones than were present, such that he would not have been able to stand, let alone walk inside to ask for a glass of water.
Similarly, Dr. Reinerd Motte, an associate medical examiner, concluded that the victim’s injuries were representative of “a homicide and not an accident,” such as “falling from [a] tree.” In so finding, Dr. Motte described how the bruises and abrasions on the victim’s body were at different stages of healing, showing that the injuries occurred over a period of time. Dr. Motte opined that had the victim fallen from a tree and hit several branches, he would have had far more injuries to his hands, feet, arms, or legs. In Dr. Motte’s view, the fact that there were “multiple forces of blunt trauma hitting [the victim’s] body in multiple areas from multiple directions” showed that “the patterns on his body [we]re inconsistent with falling from a tree.” Upon observing the large mango tree, Dr. Motte posited that there was “[n]o way [he] c[ould] take [the victim’s] *273 injury patterns and explain those with a fall from any tree,” let alone that tree. Rather, Dr. Motte believed the injuries to be far more consistent with being struck by something resembling the dimensions of the children’s small toy broom.
Dr. Phillip Colaizzo agreed with Dr. Motte that the victim’s numerous injuries were “suggestive of multiple points of impact with blunt force trauma” that were likely “the result of being beaten.” Furthermore, Dr. Colaizzo found the injuries to be inconsistent with a fall from a tree, since the victim’s injuries, by and large, did not extend to his hands, arms or legs.

The Investigation

Recognizing the extensive nature of the victim’s injuries, ER officials called law enforcement to initiate an investigation. A detective arrived at the hospital and met with McNeal, who appeared “very distraught.” McNeal signed a consent form to permit the sheriffs office to search her home. At the time, crime scene investigators took photographs of the victim, noting the “[sjevere bruising through the child’s entire torso, arms, legs, face, [and] head.”
Acting upon the consent form, Detective William Buffey visited McNeal’s home that night and investigated the nearby trees for clues of the fall. Following a search of the area, however, the detective found the cabbage palm tree devoid of “any evidentiary value,” since there were no broken limbs, tree branches, shoe impressions, or any other indication that the ground under the tree had been disturbed. The detective conceded that he neither took measurements of the mango tree nor collected any forensic evidence from it, since his investigation at that time was focused on the little cabbage palm, based on what Bannister had told McNeal.
Several days later, when McNeal was moving out of her house, she called the police after finding one of the victim’s shirts at the “bottom of the dirty clothes basket” with rips and straw broom strewn throughout it. In addition, McNeal recovered her son’s toy broom and noticed that it was missing more bristles than she remembered, suggesting that it had been used by Bannister as a weapon. Furthermore, McNeal observed that the victim’s shorts had blood in their inner mesh lining. A forensic test revealed that the blood in the shorts matched the victim. Dr. Motte testified that such blood was consistent with a slight rectal tear found on the victim, possibly resulting from a jab with the broom. McNeal also described that much of the furniture, including the chairs around the kitchen table, had been broken.

The Interview at the Red Roof Inn

Bannister’s friend, Brandon Ingraham, testified that prior to the victim’s death, Bannister called and asked Ingraham to reserve a hotel room for him and his two children. Ingraham rented a room at the Red Roof Inn in his own name and turned the keys over to Bannister. Later that night, a detective observed Bannister’s car in the Red Roof Inn parking lot. Based on the critical condition of the victim, the detective believed Bannister to be a threat to his biological children and decided to take action. Attempts to contact Bannister by telephone and by knocking on the motel room door failed. At about 5:00 a.m., a SWAT team broke down Bannister’s motel room door, handcuffed him, and removed his two children.
Once the room was secured and the SWAT team had left, Bannister’s handcuffs were removed and two detectives, dressed in plain clothes, with weapons holstered, approached him for questioning. The detectives informed Bannister that “he was free to go” and that he was not under arrest; in fact, following the interview, Bannister was allowed to drive home *274 in his own vehicle. Bannister informed the detectives of his desire to speak.
Before commencing with the interview, a detective read Bannister an abbreviated version of the Miranda warnings. Although Bannister never provided oral responses to the Miranda warnings, the detectives testified that Bannister nodded throughout and said “uh-huh” as his rights were read to him. To establish his familiarity with both interrogations and Miranda warnings, two other officers testified about earlier contacts with Bannister where he had been read his Miranda rights.
During the interview, Bannister was not “restrained in any way” and was otherwise “free to move about the room.” The detectives described the interview as relatively low-key, with no one yelling, threatening, or raising their voice. The detectives remarked that Bannister appeared competent and alert at all times, evidenced by his correcting them about the facts of the case. During the lengthy interview, in spite of the officers’ use of various interrogation techniques,[1] Bannister did not waver from his story that the victim had fallen from a tree. At some point during the questioning, Bannister asked the officers to stop questioning him, but they continued.
The primary evidentiary value of the interview came from Bannister’s identification of the palm tree as the site of the victim’s fall, while at trial he contended that the victim fell from the much taller mango tree.

The Trial Court’s Ruling

The trial court[2] entered a detailed written order granting Bannister’s motion to suppress as it pertained to the statements he made after his request to stop,[3] but otherwise denying his motion as it involved the initial statements obtained during the interview. In finding Bannister not to have been in custody at the inception of the interview, the trial court cited to Ramirez v. State, 739 So.2d 568 (Fla.1999), and found in pertinent part that: (1) Bannister was not handcuffed during the interview, (2) he was “not asked to accompany the officers back to [the] station or even placed in the back of a patrol vehicle,” (3) there was no evidence presented giving indicia of coercion or intimidating language, (4) the atmosphere of the interview was “conversational,” (5) he was informed that he was not under arrest and was free to leave at any time, and (6) he was permitted to leave on his own accord. The trial court concluded that because Bannister’s statement “was not custodial, the detectives were not obligated to inform the defendant of his Miranda warnings,” so that the sufficiency of the warnings was of no legal importance.
Because Bannister was not in custody at the time of his interview, the detectives were not required to comply with Miranda v. Arizona
Bannister contends that the trial court erred in denying his motion to suppress, since he was in custody at the time of his interview and he did not receive adequate Miranda warnings.
“A trial court’s ruling on a motion to suppress is a mixed question of fact *275 and law.” State v. R.R., 90 So.3d 919, 921 (Fla. 4th DCA 2012) (citing Shingles v. State, 872 So.2d 434, 437 (Fla. 4th DCA 2004)). “When reviewing a ruling on a motion to suppress an incriminating statement, an appellate court accords a presumption of correctness to the trial court’s factual findings, but independently reviews mixed questions of law and fact that ultimately determine constitutional issues.” State v. Jackson, 120 So.3d 88, 90 (Fla. 4th DCA 2013) (citing Connor v. State, 803 So.2d 598, 608 (Fla.2001)). “In other words, we review the trial court’s legal conclusions de novo.” Navamuel v. State, 12 So.3d 1283, 1285 (Fla. 4th DCA 2009) (citing State v. Christman, 838 So.2d 1189, 1191 (Fla. 2d DCA 2003)).
“ ‘Both the United States and Florida Constitutions provide that persons shall not be ‘compelled’ to be witnesses against themselves in any criminal matter.’” Murdock v. State, 115 So.3d 1050, 1055 (Fla. 4th DCA 2013) (quoting Ross v. State, 45 So.3d 403, 412 (Fla.2010)). “This right against self-incrimination is given effect through a person’s right to remain silent.” Joe v. State, 66 So.3d 423, 425 (Fla. 4th DCA 2011) (citing Miranda v. Arizona, 384 U.S. 436, 467-69, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).
“To protect suspects’ constitutional right against self-incrimination, law enforcement officers are required to inform them of their right to remain silent and to have counsel present at any custodial interrogation.” Black v. State, 59 So.3d 340, 344-45 (Fla. 4th DCA 2011) (citing Miranda, 384 U.S. at 444-45, 86 S.Ct. 1602) (footnote omitted). Such “Miranda warnings apply whenever a person is in the custody of the police and the police subject him or her to express questioning, or its functional equivalent, to a degree that the police should reasonably expect to elicit an incriminating response.” Deviney v. State, 112 So.3d 57, 73 (Fla.2013) (emphasis added). “Where ... the custody ... prong is absent,” however, “Miranda does not require warnings.” Timmons v. State, 961 So.2d 378, 379 (Fla. 4th DCA 2007) (citing Lewis v. State, 754 So.2d 897, 900 (Fla. 1st DCA 2000)).
“In the Miranda line of decisions, ‘custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.’ ” MacKendrick v. State, 112 So.3d 131, 136 (Fla. 1st DCA 2013) (quoting Howes v. Fields, _ U.S. _, _, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012)) (internal quotations omitted). “[C]ustodial interrogation means ‘questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.’ ” Ross, 45 So.3d at 415 (quoting Miranda, 384 U.S. at 444, 86 S.Ct. 1602). Within this realm, “custody” is determined by an objective, reasonable person standard— whether a reasonable person placed in the same position would believe that his or her freedom of action was curtailed “ ‘so that the suspect would not feel free to leave or to terminate the encounter with the police.’” Id. (quoting Connor, 803 So.2d at 605). The United States Supreme Court has explained this analysis as follows:
Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players’ lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom *276 of movement of the degree associated with a formal arrest.
Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).
To analyze the facts of a case to determine whether a person is in “custody” for Miranda purposes, Florida courts consider the following four factors:
(1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his [or her] guilt; and (4) whether the suspect is informed that he or she is free to leave.
State v. C.F., 798 So.2d 751, 754 (Fla. 4th DCA 2001) (quoting Mansfield v. State, 758 So.2d 636, 644 (Fla.2000)). In making the evaluation, no single factor may “be considered in isolation”; rather, “[t]he whole context must be considered.” State v. Pitts, 936 So.2d 1111, 1124 (Fla. 2d DCA 2006).
1. The Manner in Which the Police Summon the Suspect for Questioning
“Although not dispositive, the location of the interview is a factor that supports a trial court’s conclusion that the defendant is not in custody.” Snead v. State, 913 So.2d 724, 726 (Fla. 5th DCA 2005). Typically, “[a]n interview with a suspect in his own home is not ordinarily regarded as a custodial interrogation,” since the suspect “is not likely to have a sense that he is being detained, as might be the case if the suspect had been stopped on a highway or taken to an interrogation room at the police station.” Evans v. State, 911 So.2d 796, 800 (Fla. 1st DCA 2005). However, “just because an interrogation occurs in a suspect’s home does not mean the interrogation could never be regarded as ‘custodial.’ ” Lee v. State, 988 So.2d 52, 54 (Fla. 1st DCA 2008).
In those instances where an in-home interrogation was found to have escalated past the level of “custodial,” the interviewing officers typically either exhibited an overwhelming show of authority or confronted the defendant with contraband so indicative of guilt that a suspect would feel there is enough evidence to be arrested. See, e.g., Wolliston v. State, 961 So.2d 1141, 1142 (Fla. 4th DCA 2007) (finding defendant to be “in custody,” despite still being in his home, where he “had already been confronted with the presence of cocaine and had not been informed that he was free to leave”); Killian v. State, 761 So.2d 1210, 1214 (Fla. 2d DCA 2000) (finding in favor of being “in custody” where “[ajlthough the questioning of Killian by Detective Curry occurred in Killian’s home, that home was being searched pursuant to a warrant by four other law enforcement officers”); Garcia v. State, 88 So.3d 394, 401-02 (Fla. 4th DCA 2012) (“Although Detective Torres had Garcia removed from the patrol car and his handcuffs removed before asking Garcia to come to the public safety building with the officers, a reasonable person in Garcia’s position would likely interpret the previous show of authority as an indication that he had no choice but to comply with Detective Torres’s request.”).
However, even where there is a significant show of authority, that coerciveness may be dissipated if the defendant has reason to believe that such a period of detainment has ended. See, e.g., Anthony v. State, 108 So.3d 1111, 1117-18 (Fla. 5th DCA 2013) (finding the defendant not to be in custody where a police officer removed her handcuffs and took her out of the police car, the interview occurred in the defendant’s spare bedroom, the defen *277 dant was considered a witness rather than a suspect, the door to the spare room was left open, and the defendant was permitted to freely walk about the residence); Parks v. State, 644 So.2d 106, 107 (Fla. 4th DCA 1994) (causal link between arrest and incriminating statements to police broken where the defendant was released from custody on an unrelated charge but voluntarily remained to answer questions).
In this case, the initial show of authority was explicit. At 5:00 a.m., a SWAT team breached the motel room door with a battering ram, handcuffed Bannister, and forcibly removed his two children. By the time the interview with the detectives began, Bannister had been at the center of a turbulent whirlwind of accusatory activity.
The trial court concluded that the detectives’ subsequent conduct operated to dissipate the earlier accusatory conduct. Furthermore, the trial court found it significant that Bannister’s statements were taken in a motel room, rather than the police station. The manner in which the detectives began to question Bannister— the removal of the handcuffs, the non-station house setting, and the detectives’ conversational manner — militates against a finding that Bannister was in custody.
2. The Purpose, Place, and Manner of the Interrogation
Generally, “ ‘in the absence of any indicia of coercion or intimidating circumstances, police questioning about criminal conduct or activity alone, does not convert an otherwise consensual encounter into a custodial interrogation.’ ” State v. Scott, 786 So.2d 606, 609 (Fla. 5th DCA 2001) (quoting Ramsey v. State, 731 So.2d 79, 81 (Fla. 3d DCA 1999)). Thus, even where a defendant is questioned regarding criminal activity, custody will not be shown where the defendant is neither accused of the crime, nor addressed in a threatening manner. See, e.g., Peterson v. State, 94 So.3d 514, 528 (Fla.2012) (“While Jackson asked numerous questions concerning how Peterson committed the murder, the manner of their conversation does not show any type of pressure at all.”); State v. Perez, 58 So.3d 309, 312 (Fla. 5th DCA 2011) (“The testimony also indicated the interview was conducted in a non-threatening manner and the tone was conversational, not confrontational.”).
In this case, the evidence supports the trial court’s finding that neither detective attempted to intimidate Bannister through physical threat, as neither ever removed their guns from their holsters, Bannister was permitted free rein to walk around the room, and the detectives allowed him to sit in the area closest to the open door. See State v. Alioto, 588 So.2d 17, 18-19 (Fla. 5th DCA 1991) (stating “three situations in which a reasonable person might believe he or she was not free to leave: if an officer (1) brandished a weapon, (2) touched the suspect, or (3) used language or a tone indicating compliance could be compelled” (citing United States v. Long, 866 F.2d 402 (11th Cir.1989))).

3. The Extent to Which the Suspect Is Confronted With Evidence of His or Her Guilt

While not necessarily the decisive factor, “the extent to which the suspect is confronted with evidence of his or her guilt can be a circumstance that weighs heavily in the balances.” Pitts, 936 So.2d at 1127 (internal quotations omitted). “The awareness of the person being questioned by an officer that he has become the ‘focal point’ of the investigation, or that the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom .... ” United States v. Bengi- *278 venga, 845 F.2d 593, 597 n. 16 (5th Cir. 1988) (emphasis in original) (citation omitted). As the second district has explained:
A reasonable person understands that the police ordinarily will not set free a suspect when there is evidence “strongly suggesting” that the person is guilty of a serious crime. That does not mean that whenever a suspect is confronted with some incriminating evidence, the suspect is in custody for purposes of Miranda. The significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect’s position as well as the nature of the offense. If a reasonable person in the suspect’s position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping, that circumstance militates strongly toward the conclusion that the suspect is in custody.
Pitts, 936 So.2d at 1128 (footnotes omitted).
In this case, the outset of the interview began conversationally and innocuously, with the detectives allowing Bannister to fully explain his side of the story. However, as the implausibility of many of Bannister’s contentions became apparent,[4] the detectives shifted gears from passively listening to actively confronting him. Nonetheless, this switch did not shake Bannister’s story; he was consistent in ascribing the victim’s injuries to the fall from the palm tree.
Under these circumstances, Bannister’s interview must be dichotomized. At the early portion of the interview, during which Bannister recounted his story without interruption, any indicia of coercion was completely absent, favoring non-custody. However, when the officers accused Bannister of lying, informed him that the victim was in critical condition, and stated that the injuries were inconsistent with a fall, a reasonable person in Bannister’s position may have believed that he or she was a “suspect” in an extremely serious crime, although perhaps without the understanding “that the police [had] probable cause to arrest.” Id. at 1128. On balance, this factor weighs in favor of a finding of custody.
4. Whether the Suspect Is Informed That He or She Is Free To Leave
As both detectives testified, and as found by the trial court, Bannister “was repeatedly informed by the detectives that he was free to leave at any time.” In fact, when the interview ended, Bannister was not arrested, but was instead permitted to drive home by himself. Release of an interviewee at the end of questioning is relevant to the “custody” inquiry. See Howes, 132 S.Ct. at 1189. This factor favors heavily against a finding of custody.
Considering the totality of the circumstances, we find that the greater weight of the trial judge’s factual findings supports his legal conclusion that the interrogation was non-custodial. We do not therefore reach the issue of the legal sufficiency of the Miranda warnings.

The trial court did not err by failing to instruct the jury that it could request a read-back of the trial testimony

In his second issue on appeal, Bannister contends that the successor judge who presided at the trial abused his discretion by failing to instruct the jury in two instances that it could request a read-back of trial testimony. We hold that no instruction on a read-back was necessary because *279 the jury did not pose a question about hearing any of the in-court testimony again.
While “[t]here is no rule of criminal procedure providing that a jury may view a transcript of the proceedings,”[5] Florida Rule of Criminal Procedure 8.410[6] “provides that a trial court may, in its discretion, have portions of the trial testimony read back to the jury upon request.” Adams v. State, 122 So.3d 976, 979 (Fla. 2d DCA 2013). Rule 3.410 imparts upon trial courts “wide latitude in the area of the reading of testimony to the jury.” Avila v. State, 781 So.2d 413, 415 (Fla. 4th DCA 2001). However, where a jury requests transcripts or a “read-back” of trial testimony, the trial court “may not, over objection, simply instruct the jurors to rely on their own collective recollection of the evidence so as to possibly mislead the jurors into believing that read-backs are prohibited.” Delestre v. State, 103 So.3d 1026, 1027-28 (Fla. 5th DCA 2012) (citation omitted). Rather, the trial court must abide by two rules:
(1) [the] trial court should not use any language that would mislead a jury into believing read-backs are prohibited, and
(2) when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back.
Hazuri v. State, 91 So.3d 836, 846 (Fla.2012) (emphasis added).

The Jury’s Request for Deposition Testimony

In this case, during deliberations, the jury submitted the following question to the trial judge: “Can we get any of the deposition^] Can we get the pictures[?]” In response, the trial judge engaged in the following dialogue with one of the jurors:
Juror: Judge, the question was based on a question in the room pertaining to witness testimony. In the process of the questioning, they read from the transcript.
The Court: Correct, but that transcript is not in evidence, okay.
Juror: Got you.
The Court: To the extent that it was referred to, there may have been some language that was quoted. The evidence that you have before you is the oral recitation of the portions of the depositions, okay.
As can be seen from the juror’s specific question, the jury was not requesting a read-back of the witness’s testimony, but rather hard copies of the depositions read by the attorneys and witnesses on the stand during trial. Such witness depositions are never permitted to travel into the jury room for use during deliberations. See Young v. State, 645 So.2d 965, 967 (Fla.1994) (recognizing the “prejudicial effect” of “submitting depositions to the jury during deliberations”).
In those cases holding that a read-back instruction was warranted, the jury either requested trial transcripts or identified specific witness testimony they desired to have recounted. See, e.g., State v. Barrow, 91 So.3d 826, 831 (Fla.2012) (read-back *280 required where ten minutes into deliberations, the jury submitted a request for “all the transcripts of the witnesses’ testimonies”); Avila, 781 So.2d at 414 (jury requested to “review the timing of specific events set forth by the testimonies of four named alibi witnesses”); Roper v. State, 608 So.2d 533, 533-34 (Fla. 5th DCA 1992) (jury requested to “see” the victim’s cross examination). Here, by contrast, the jurors requested not to hear specific testimony, but to review the actual depositions read by the witnesses on the stand. Since such request did not concern trial testimony, the trial court did not err by failing to provide the jury with the option of a read-back.

Date of the Mango Tree Video

In the second instance, one of the jurors, after watching the defense’s video of the mango tree, asked the trial judge if it would be “ok to ask the day that [the video] was taken.” In turn, the trial judge responded that it “was part of the testimony.” When the court went into recess, defense counsel engaged the court on the matter as follows:
[Defense counsel]: Judge, on that question that [the juror] just asked, I mean, I know no judge likes to say they could have a read back, but if there’s a question, they have a read back on that, or they can rely on their own memory, but, or we can stipulate to what the testimony was, but they have a right to an answer. I mean, the testimony was October 25 of 2002.
[The prosecutor]: They typically ask for a read back so—
[Defense counsel]: He asked, could he ask.
[The prosecutor]: They could go back and deliberate, and if they want to ask, they can come and do it like they do everything else.
The Court: I am not going to bring them back out to tell them the date; that they should rely on what they heard.
This matter is analogous to the issue presented in Frasilus v. State, 46 So.3d 1028 (Fla. 5th DCA 2010), rev. denied, 69 So.3d 277 (Fla.2011). There, after entering deliberations, the jury submitted the following question: “When was the picture taken on the Department of Highway and Safety? What date, the issue date or duplicate?” Id. at 1029. In response, the trial judge instructed the jury that it would “have to use [its] best recollection of the evidence.” Id. In affirming the trial court’s instruction, the fifth district distinguished those cases where the jury either “ask[ed] to review a transcript or examine testimony,” since the trial judge at issue was merely “asked for an answer to a fact question.” Id. at 1031 (emphasis added). Thus, the court held that a jury’s fact question does not “give[ ] rise to a duty to inform the jury that it may request a read-back of any relevant testimony.” Id.; see also Coleman v. State, 610 So.2d 1283, 1286 (Fla.1992) (holding that a trial court need not answer questions of fact from a jury).
In this case, much like Frasilus, the jury requested the court to answer a specific fact question regarding the date of the defense’s mango tree video. Since the jury neither requested trial transcripts nor a “read-back” of the trial testimony, the trial court was not obligated to provide a “read-back” instruction.

Judgment of Acquittal

Finally, Bannister challenges the denial of his motion for judgment of acquittal because the State failed to exclude his reasonable hypothesis of innocence— that the victim fell out of the mango tree. The reasonableness of this hypothesis was compromised by Bannister’s statement at *281 the taped interview that the victim fell out of the cabbage palm tree, and was significantly challenged by the expert testimony that the victim’s injuries were consistent with abuse and not a fall from a tree. Accordingly, there was no error in the denial of the motion.

Affirmed.

WARNER and LEVINE, JJ., concur.

. See, e.g., Eugene v. State, 53 So.3d 1104, 1110 (Fla. 4th DCA 2011) (giving examples of interrogation techniques).

. The trial court ruled on the pretrial motion and the successor judge presided at the trial.

. The State conceded that statements after his request to stop should be suppressed.

. For example, when asked why he took his two children to a motel room rather than their home, Bannister explained that he was "scared” to be alone in the house at night since there was “a ghost in there or something” and "spooky stuff going on in there.”

. See Fla. R. Crim. P. 3.400.

. Rule 3.410 provides:
After the jurors have retired to consider their verdict, if they request additional instructions or to have any testimony read or played back to them they may be conducted into the courtroom by the officer who has them in charge and the court may give them the additional instructions or may order the testimony read or played back to them. The instructions shall be given and the testimony presented only after notice to the prosecuting attorney and to counsel for the defendant....