DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**GREG SENSER,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D16-2893

[May 9, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Sandra K. McSorley and Samantha Schosberg Feuer, Judges; L.T. Case No. 50-2010-CF-009781-AXXX-MB.

Carey Haughwout, Public Defender, and J. Woodson Isom, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Heidi L. Bettendorf, Assistant Attorney General, West Palm Beach, for appellee.

DAMOORGIAN, J.

Appellant, Greg Senser, appeals his judgment and ensuing life sentence for the second-degree murder of Jason Barnett (the "Victim"). Because a statement taken from Appellant in violation of *Miranda*[1] was admitted against Appellant at trial, we reverse and remand for a new trial.

**Factual Background**

Responding to a disturbance call at an apartment building at around two in the morning, police encountered Appellant running away from the building and found the Victim bleeding profusely from a large cut to his neck. The Victim died from his injuries and Appellant was charged with second-degree murder. Before trial, Appellant moved to suppress certain statements outlined below, arguing that they were taken in violation of *Miranda*.

---

[1]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

At the suppression hearing, the officers who reported to the call testified regarding the circumstances in which Appellant made the challenged statements. The two officers who pursued Appellant on foot testified that upon seeing Appellant running away from the apartment building, they yelled "stop, police!" However, Appellant continued to run and lost the officers by hiding in some nearby hedges. When Appellant emerged from the hedges about ten minutes later, the officers pulled their weapons and ordered Appellant to the ground. The officers then approached Appellant, who was soaking wet and bleeding from a cut to the head, and handcuffed him. Without notifying Appellant of his *Miranda* rights, one of the officers asked Appellant "why are you running, why are you running" to which Appellant responded that he "was being followed by a black male and that he was shooting at him and he was scared for his life." Both officers involved testified that at the time this exchange occurred, they did not know whether Appellant was a suspect, a victim, a witness, or whether there was even a crime.

While the two officers were pursuing Appellant, the remaining officers reporting to the call encountered the Victim in the apartment building's breezeway lying face down and hemorrhaging from his neck. The officers called for a medic and began rendering aid to the Victim. A few minutes later, the officers who apprehended Appellant returned to the scene with Appellant and had him sit (still cuffed but not yet *Mirandized*) in the near vicinity. At this point, one of the officers rendering aid overheard Appellant say "it was just a fight, I didn't mean to kill him."

Considering the foregoing, the court denied Appellant's motion to suppress as it pertained to Appellant's response to the "why are were you running" question and his "it was just a fight, I didn't mean to kill him" utterance. The court reasoned that the officer was not required to inform Appellant of his *Miranda* rights before asking why he was running because, from the officer's point of view, he was "maintaining the status quo" and "identifying what was going on." With respect to Appellant's "it was just a fight, I didn't mean to kill him" utterance, the court ruled that the statement was admissible because it was not made in response to a law enforcement question and was, therefore, a "spontaneous statement."

The case proceeded to trial wherein the State introduced evidence of the circumstances surrounding the disturbance call, Appellant's relationship with the Victim, law enforcement's pursuit of Appellant, Appellant's non-suppressed statements to law enforcement, and the physical evidence collected from the scene. The officers who reported to the disturbance call each offered testimony mirroring their testimony at the suppression hearing. Pursuant to the court's suppression ruling, the

officers who pursued Appellant testified that after being asked why he was running upon apprehension, Appellant stated that he had been shot at by a black male and was scared for his life. Likewise, the officer who was rendering aid testified that upon seeing the Victim, Appellant stated something to the effect of "it was just a fight, I didn't mean to kill him."

The Victim had injuries consistent with significant blunt force trauma to the face, mouth, and nose, and his throat was cut from ear to ear all the way down to the cervical spine. The medical examiner opined that the Victim's neck wound was the result of several cuts with a sharp instrument. The Victim also had an abrasion on the back of his head and on his elbows, but did not have any defensive knife wounds. Appellant, in turn, had a minor cut on his head, some scratches on his neck and shoulder, a bruise on his left knee, and cuts on the knuckles of his right hand. His hands were also swollen.

Appellant's truck was found parked in the parking lot in front of the apartment building. A post-arrest inspection of the area where Appellant disappeared into the hedges revealed that there was blood on the top of the fence behind the hedges and on a spigot on the other side of the fence. This evidence led law enforcement to conclude that Appellant jumped the fence and rinsed himself off before jumping back over and emerging from the hedges. However, despite a search of the apartment building, the surrounding area, and Appellant's vehicle, law enforcement did not find any evidence that a firearm was used or fired on the night of the murder and likewise did not recover the instrument used to cut the Victim.

At trial, Appellant argued that he acted in self-defense and that law enforcement botched the investigation by not fully exploring the possibility that another person attacked the Victim and Appellant. To support this theory of defense, during its cross-examination of the testifying officers, Appellant's counsel highlighted the fact that law enforcement failed to set up a perimeter of the scene and, therefore, could not ensure that a third person was there and ran away. Further, when defense counsel cross-examined the medical examiner, it emphasized the lack of defensive wounds on the Victim. Defense counsel also asked the medical examiner if it was "possible that [the Victim's neck] wound could be consistent with one person holding his hands or arms behind his back preventing him from putting his hands up to defend himself while the other individual slashed his throat." The medical examiner answered that it was "one scenario."

At the conclusion of the case, based on the theories suggested by Appellant, the State asked the court to provide the jury the following

principals instruction in the event that the jury accepted Appellant's suggestion that a third party was involved in the altercation which led to the Victim's death:

PRINCIPALS

If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if

1. The defendant had a conscious intent that the criminal act be done; and

2. The defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit the crime.

To be a principal, the defendant does not have to be present when the crime is committed.

The court agreed to provide the instruction.

The jury found Appellant guilty of second-degree murder and the matter proceeded to sentencing where family members from both the Victim's and Appellant's families testified. During the sentencing hearing, the prosecutor argued that Appellant should "be held to a higher standard" because Appellant "has been afforded and given every valuable opportunity in this world. He comes from a very nice family, a very hardworking family, we're venturing to say a wealthy family, a very good-looking family, a white family, an affluent family, a wealthy family, a loving family most importantly." Defense counsel objected to this argument, contending that the argument that someone should "be treated different because they're white, black or whatever color" was improper. The court noted the defense's objection and proceeded to sentence Appellant to life in prison based on the court's consideration of Appellant's prior criminal history and the violent nature of the crime.

On appeal, Appellant challenges the admission of his pre-*Miranda* statements. Additionally, he challenges the court's decision to give the principals instruction. Finally, Appellant argues that his sentence was based on improper considerations, namely his race. We hold that the admission of the "I was shot at by a black male and am scared for my life" statement was improperly admitted and requires reversal. Although this

4

resolves the appeal, we also briefly write to address the remaining issues raised by Appellant.

**Analysis**

1) The Suppression Rulings

"The standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo." *Backus v. State*, 864 So. 2d 1158, 1159 (Fla. 4th DCA 2003). Whether an officer's action "constitutes [an] 'interrogation' for *Miranda* purposes, is a legal conclusion reviewed de novo." *State v. Lantz*, 43 Fla. L. Weekly D449, D449 (Fla. 1st DCA Feb. 23, 2018).

The Florida and United States Constitutions protect those arrested for committing crimes against being compelled to become witnesses against themselves in their own criminal cases. U.S. Const. amend. V; Fla. Const. art. I, § 9; *Ramirez v. State*, 739 So. 2d 568, 572–73 (Fla. 1999). In *Miranda*, the United States Supreme Court held that in order to safeguard these constitutional protections, suspects arrested for crimes must be notified of their "right to remain silent, that any statement [made] may be used as evidence against [them], and [of the] right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. However, "[t]he safeguards provided by *Miranda* apply only if an individual is in custody **and** subject to interrogation." *Timmons v. State*, 961 So. 2d 378, 379 (Fla. 4th DCA 2007) (emphasis added).

Here, both Appellant and the State agree that Appellant was forcibly handcuffed and detained. Therefore, Appellant was in custody at the time he gave both of the challenged statements. They also agree that Appellant was not advised of his *Miranda* rights before he made either statement. Thus, the pertinent question is whether Appellant was subject to interrogation when he made either statement.

The Supreme Court examined the concept of interrogation in the context of *Miranda* in *Rhode Island v. Innis*, 446 U.S. 291, 299–302 (1980). The *Innis* court explained that under *Miranda*, an interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–01. The "functional equivalent" of express questioning is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnotes omitted). "The focus of the inquiry is 'primarily upon the perceptions of the suspect, rather than the intent of

the police[,]' as 'the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.'" *Timmons*, 961 So. 2d at 380 (quoting *Innis*, 446 U.S. at 301). Citing *Innis*, the Florida Supreme Court reiterated that an "[i]nterrogation takes place . . . when a person [in custody] is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response." *Traylor v. State*, 596 So. 2d 957, 966 n.17 (Fla. 1992). "Thus, the standard as to whether a custodial interrogation has occurred is an objective one." *Moore v. State*, 798 So. 2d 50, 53 (Fla. 1st DCA 2001).

Interpreting *Innis*, Florida courts have held that questions regarding basic identification information are not interrogation questions subject to *Miranda* because they are designed to garner essential biographical data rather than an incriminating response. *See Allred v. State*, 622 So. 2d 984, 987 n.9 (Fla. 1993) (routine booking questions, such as "[n]ame, address, height, weight, eye color, date of birth, and current age," are not subject to *Miranda*); *Tobiassen v. State*, 213 So. 3d 1045, 1050 (Fla. 4th DCA 2017) (employment related question asked during the booking process was not subject to *Miranda*); *Timmons*, 961 So. 2d at 380 (asking a suspect if he was staying at the hotel where the police were performing a sweep was not an interrogation question subject to *Miranda*).

Likewise, innocuous conversational questions on unrelated topics do not constitute interrogation questions subject to *Miranda*. For example, in *State v. Koltay*, 659 So. 2d 1224, 1225 (Fla. 2d DCA 1995), while transporting an arrested but un-*Mirandized* suspect to a police station, the transporting officer engaged in small talk with the suspect. As the conversation progressed, the officer asked the suspect why he recently left an emergency mental health shelter. *Id.* In response, the defendant became irate and said, "I'm not crazy just because I f——d a little girl." *Id.* Although the suspect was in custody and his response was incriminating, the court held there was no custodial interrogation because the "question was not reasonably likely to elicit an incriminating response." *Id.* at 1226.

However, when an officer's questions or actions extend beyond requests for basic biographical information and could reasonably be viewed as designed to secure potential incriminating evidence, the questions or actions constitute an interrogation. For example, asking a suspected drunk driver to recite the alphabet is an interrogation because the suspect's response could foreseeably be used against him. *Allred*, 622 So. 2d at 987. Additionally, confronting a custodial suspect with a reference to the underlying crime or evidence of the crime amounts to an

interrogation because such actions could reasonably prompt an incriminating response. *Origi v. State*, 912 So. 2d 69, 73 (Fla. 4th DCA 2005) (officer's act of grabbing suspect by the hand, holding out a cooler full of drugs, and stating "that's a lot of drugs you had" constituted an interrogation); *State v. Lebron*, 979 So. 2d 1093, 1095 (Fla. 3d DCA 2008) (officer's statement "I hope you know what kind of trouble you are in," amounted to an interrogation requiring administration of *Miranda*); *Larson v. State*, 753 So. 2d 733, 734–35 (Fla. 2d DCA 2000) (where law enforcement officer mentioned to the suspect that he was "looking at twenty-five years" for his involvement in the case, the officer's statements were an interrogation because they "were reasonably likely to elicit an incriminating response from [the defendant]").

### a. The "A Black Man Was Shooting at Me and I'm Scared for my Life" Statement

The first statement at issue, "a black man was shooting at me and I'm scared for my life," was made by Appellant in response to an officer asking "why were you running?" The trial court ruled that the question was not subject to *Miranda* because, from the officer's perspective based on the information available to him at the time, it was meant to garner background information rather than an incriminatory response. As discussed above, this was not the correct legal standard. Instead of examining the question from the officer's subjective point of view, the court was required to look at the question objectively and consider whether a reasonable person in the suspect's position would conclude that the question was designed to lead to an incriminating response. *Traylor*, 596 So. 2d at 966 n.17.

Looking at the scenario from a reasonable person in Appellant's position, Appellant was chased by law enforcement while running away from a crime scene, ordered to the ground at gun point, handcuffed, then asked "why were you running?" Under these circumstances, although law enforcement may not have been aware that there was a crime or that Appellant was the suspect, from the perspective of a reasonable person in Appellant's position, the question "why are you running" was reasonably designed to elicit inculpatory information. As opposed to simple questions calling for one word safety related responses, such as "are you okay" or "are you in danger," the question "why are you running" required an <u>explanation</u> as to why Appellant was actively fleeing law enforcement. In this context, virtually any information given in response to the question could be incriminating. Indeed, even though Appellant responded by indicating that he was a victim, this statement was nonetheless used against him at trial as proof that the defendant lied about the nature of

the encounter. Accordingly, Appellant's statement was the result of a custodial interrogation and, therefore, was subject to the protection of *Miranda*. As Appellant was not advised of his *Miranda* rights, the statement should have been suppressed. Based on the foregoing, the court's admission of the "a black man was shooting at me and I'm scared for my life" statement requires reversal for a new trial.[2]

### b. The "It Was Just a Fight, I Didn't Mean to Kill Him" Statement

With respect to Appellant's "it was just a fight, I didn't mean to kill him" statement, the evidence surrounding this statement establishes that it was uttered spontaneously by Appellant. Furthermore, the statement was not the result of any law enforcement question or confrontation. Therefore, the statement was not subject to *Miranda*. *See Gordon v. State*, 213 So. 3d 1050, 1054 (Fla. 4th DCA 2017) (defendant's unprovoked statements to deputy who was watching defendant in a holding cell while defendant was awaiting transportation were not the result of an interrogation and, therefore, were not subject to the requirements of *Miranda*); *Drout v. State*, 99 So. 3d 549, 549 (Fla. 3d DCA 2011) ("Because the record fully supports the trial court's finding that the statements were spontaneously uttered and not the product of the functional equivalent of a police interrogation, we affirm."). Accordingly, we hold that the trial court correctly ruled that Appellant's "it was just a fight, I didn't mean to kill him" statement was admissible at trial.

### 2. The Principals Jury Instruction

Appellant next argues that the court abused its discretion when it granted the State's request to provide the jury with a principals instruction because "the record facts did not support an inference that [Appellant] acted in concert with another to accomplish his objective." We disagree.

"Trial judges have wide discretion in decisions regarding jury instructions, and the appellate courts will not reverse a decision regarding an instruction in the absence of a prejudicial error that would result in a miscarriage of justice." *Lewis v. State*, 693 So. 2d 1055, 1058 (Fla. 4th DCA 1997). "Jury instructions requested by the State 'must relate to

---

[2] Based on the manner the statement was used, the State concedes that in the event the statement was improperly admitted, the error could not be harmless. *Deviney v. State*, 112 So. 3d 57, 79 (Fla. 2013) ("*Miranda* violations are subject to a harmless error analysis.") (citing *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986)).

issues concerning evidence received at trial.'" *Id.* at 1057 (quoting *Butler v. State*, 493 So. 2d 451, 452 (Fla. 1986)).

> Therefore, it is generally error to instruct the jury on principals where there is no evidence to support an aiding and abetting theory of guilt because the jury may be confused by the instruction. However, in order for the unnecessary instruction to constitute reversible error, it must, under the circumstances of the case, be capable of misleading the jury in such a way as to prejudice the defendant's right to a fair trial.

*Id.*

In *Lewis*, this Court held that the trial court did not abuse its discretion in granting the State's request for a principals instruction in a case where the defendant was accused of throwing a Molotov cocktail through his ex-girlfriend's window. *Id.* at 1056. There, during trial, the State asked the court for the instruction in the event that the jury assumed someone else actually threw the Molotov cocktail, although there was no evidence of any such third party involvement. *Id.* We affirmed on appeal, reasoning that the State's argument to the jury that the defendant "either knew what was going to happen, played an active role in making it happen, or he threw it through that bedroom window" was sufficient to support the instruction. *Id.* at 1058.

In the instant case, through his evidence and questioning of various witnesses, Appellant advanced a theory that there was another person involved in the Victim's death. Specifically, in opening arguments, defense counsel argued that law enforcement botched the investigation by not fully exploring the possibility that another person attacked the Victim and Appellant. To support this theory of defense, during its cross-examination of the testifying officers, Appellant's counsel highlighted the fact that law enforcement failed to set up a perimeter of the scene and, therefore, could not ensure that a third person was there and ran away. Further, when counsel cross-examined the medical examiner, he asked the medical examiner if it was "possible that [the Victim's neck] wound could be consistent with one person holding his hands or arms behind his back preventing him from putting his hands up to defend himself while the other individual slashed his throat". The medical examiner answered that it was "one scenario." Accordingly, since the defense presented evidence that there may have been another individual involved, there was evidence supporting the instruction.

9

### 3. Improper Sentencing Considerations

Lastly, Appellant argues that his life sentence was based on impermissible sentencing factors. It is more than well established that a court's reliance on constitutionally impermissible factors, such as race and national origin, when imposing a sentencing is a violation of a defendant's due process rights. *Santisteban v. State*, 72 So. 3d 187, 197 (Fla. 4th DCA 2011); *Nawaz v. State*, 28 So. 3d 122, 124–25 (Fla. 1st DCA 2010). However, when determining whether a court relied on impermissible sentencing factors, it is primarily the court's express rationale, not the evidence or arguments presented at sentencing, which controls. *Compare Nusspickel v. State*, 966 So. 2d 441, 446 (Fla. 2d DCA 2007) (fact that evidence of improper sentencing factor was presented at sentencing did not merit resentencing when the court expressly wrote that its sentence was not based on that evidence), *with Santisteban*, 72 So. 3d at 197 (holding that court based sentence on impermissible factor of religion when it expressly stated that it was being mindful of Jewish tradition in "imposing a sentence over the loss of life of four Jewish people"), *and Soto v. State*, 874 So. 2d 1215, 1216 (Fla. 3d DCA 2004) (appellate court was "compelled by the judge's own statements" that it was considering defendant's unwillingness to admit guilt in sentencing).

In the instant case, the prosecutor argued that Appellant should be held to a "higher standard" in part because of the privilege afforded by his race. Although the court's express rationale for imposing its sentence does not suggest that it relied on the prosecutor's race argument when it rendered its sentence, we are nonetheless compelled to comment on this situation. The prosecutor's race-based argument was highly improper under any view and should not have been made. Yet, when Appellant objected, the court merely noted the objection for the record. We urge courts faced with similar situations in the future to admonish any lawyer advocating for an improper sentencing consideration and make it clear on the record that such an improper factor is not a basis for the imposed sentence.

In conclusion, we hold that Appellant is entitled to a new trial based on the admission of his statement to the effect of "a black man was shooting at me and I'm scared for my life" because the statement was the result of a custodial interrogation and Appellant was not advised of his *Miranda* rights.

*Reversed and remanded.*

GERBER, C.J., and KLINGENSMITH, J., concur.

*        *        *

*Not final until disposition of timely filed motion for rehearing.*