DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MELANIE EAM,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-1035

[September 16, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 502016CF011454A.

Carey Haughwout, Public Defender, and David John McPhernin, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Kimberly T. Acuña, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals her conviction for second-degree murder with a weapon and sentence of 50 years. She argues the trial court erred in denying her motion to suppress. We disagree and affirm.

The defendant and victim were involved in a romantic relationship. When the victim told the defendant that he did not love her, she killed him using a butcher knife from his kitchen. The State charged her with second-degree murder with a weapon.

A neighbor's video surveillance showed the defendant's vehicle coming and going from the victim's house on the evening of the stabbing. Afterwards, law enforcement was unable to locate her. The next day, the defendant's cousin contacted a Florida detective ("FL detective") and told him the defendant fled to her aunt's house in Maryland.

The Florida detective and Maryland police confirmed the defendant's location in Maryland and impounded her car. The Maryland police surveilled the aunt's house in unmarked units. Around eleven hours later, the same cousin permitted the detective and a Maryland law enforcement officer to enter the house. The following conversation ensued when the detective encountered the defendant:

> **FL Detective:** I'm not here to arrest you . . . I'm here to take your statement. That's it, just to talk to you. And you can just come with me . . . to the police station. I promise, my word, we'll bring you back here tonight.

> **Defendant:** Am I gonna be provided a lawyer before I say anything?

> **FL Detective:** Are you gonna be -- we're not gonna provide you one. You're just gonna come to the station and talk with me . . . that's voluntary . . . you're not under arrest.

> **FL Detective:** This is your opportunity to give your side of the story or explanation of what happened . . . you wanna talk here. We can talk here.

> **Defendant:** I am allowed to be provided with a lawyer.

> **FL Detective:** You could have retained an attorney – all the time, you could have retained . . . of course you could have . . . why would you need an attorney? Don't you need to explain what happened?

> **FL Detective:** This is your opportunity cause you're not gonna get another opportunity most likely . . . you know what an attorney would tell you to do. He won't let you explain yourself. This is your opportunity right now.

Because the defendant did not want to leave the house, the Florida detective conducted the interview at the kitchen table—in the presence of the defendant's two cousins. He recorded the 34-minute interview on his iPhone. During the recorded interview, the defendant confessed to stabbing the victim and gave the FL detective a t-shirt she wore the night of the stabbing.

After the interview, the Florida detective asked if the defendant felt "like [she] was under arrest and wasn't free to leave?" She stated she "was not

2

sure what to expect," and continued to converse with the detective. The defendant expressed she felt "very comfortable . . . more comfortable than I had expected."

The defendant moved to suppress the confession and evidence derived from it, arguing the statements occurred during a custodial interrogation without *Miranda*[1] warnings. The defendant argued the Florida detective also denied her Fifth and Fourteenth Amendment rights when he continued to interview her after she unequivocally requested an attorney.

The trial court held an evidentiary hearing. At the hearing, the defendant argued for the first time that the Florida detective "misstated the law to coerce [her] into speaking." The State responded it was a non-custodial interrogation because the Florida detective:

- did not place the defendant under arrest;

- expressly told her multiple times she was not under arrest;

- interviewed her in the presence of her two cousins;

- accepted her refusal to go to the police station;

- conducted the voluntary interview in a polite and short manner; and

- did not aggressively confront her.

The State further reasoned that the surveillance officers did not stop other cars entering and exiting the area or the defendant's family members, including the cousin, who entered and exited the house during the surveillance.

The Florida detective testified that he did not read the defendant *Miranda* warnings because they were unnecessary. He did not believe the defendant had a right to have an attorney present because this was a non-custodial interview. He testified that no one asked him to stop the interview or leave. Had anyone done so, he would have left.

The defendant and cousin testified they did not feel free to leave the house before the Florida detective arrived because the Maryland police

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

seized the defendant's car and sat outside of the house in unmarked cars all day. But the defendant acknowledged she could have found other modes of transportation.

The trial court denied the motion to suppress. The court found the defendant's Fifth Amendment rights were not implicated because she was not subject to a custodial interrogation under *Ramirez v. State*, 739 So. 2d 568 (Fla. 1999). The court found the Florida detective's statement—that an attorney would advise the defendant not to speak or that she "most likely" would not have the opportunity to explain the story again—did not rise to a material misstatement of law.

At trial, the court admitted and played the recorded interview. Among other evidence was the recording of the defendant's car at the victim's home on the evening of the murder, the victim's blood found in the defendant's car, and the defendant's cell phone found at the victim's home. The jury found the defendant guilty of second-degree murder with a weapon. The trial court adjudicated her guilty and sentenced her to 50 years in prison. From her conviction and sentence, the defendant now appeals.

The defendant argues the trial court erred in denying her motion to suppress because she was: 1) subjected to a custodial interrogation; 2) not advised of her *Miranda* rights; and 3) denied her Fifth Amendment right to counsel. The State responds the defendant was not in custody when interviewed by the Florida detective and therefore not entitled to *Miranda* rights or counsel. Even if the trial court erred, the State argues any error was harmless. The threshold inquiry is whether the defendant was subject to a custodial interrogation.

"A trial court's ruling on a motion to suppress is a mixed question of fact and law." *Bannister v. State*, 132 So. 3d 267, 274–75 (Fla. 4th DCA 2014) (quoting *State v. R.R.*, 90 So. 3d 919, 921 (Fla. 4th DCA 2012)). "When reviewing a ruling on a motion to suppress an incriminating statement, an appellate court accords a presumption of correctness to the trial court's factual findings, but independently reviews mixed questions of law and fact that ultimately determine constitutional issues." *Id.* at 275 (quoting *State v. Jackson*, 120 So. 3d 88, 90 (Fla. 4th DCA 2013)). We have de novo review of legal conclusions. *Id.*

"Both the United States and Florida Constitutions provide that persons shall not be 'compelled' to be witnesses against themselves in any criminal matter." *Id.* (quoting *Murdock v. State*, 115 So. 3d 1050, 1055 (Fla. 4th DCA 2013)). To protect a suspect's Fifth Amendment right against self-

incrimination during a custodial interrogation, that person must be informed of his or her *Miranda* rights, including the "right to remain silent, that any statement [made] may be used as evidence against him [or her], and [the] right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444; *see also Bannister*, 132 So. 3d at 275.

*Miranda* warnings, however, "apply **only** if an individual is in custody and subject to interrogation." *Senser v. State*, 243 So. 3d 1003, 1008 (Fla. 4th DCA 2018) (emphasis added). If the interrogation is non-custodial, an officer does not need to give *Miranda* warnings. *Bannister*, 132 So. 3d at 275. Nor is the officer required to provide a lawyer on the individual's request or stop questioning. *Caldwell v. State*, 41 So. 3d 188, 198 (Fla. 2010).

"A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed **to a degree associated with actual arrest**." *Ramirez*, 739 So. 2d at 573 (emphasis added). This determination requires the consideration of:

> (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.

*Id.* at 574 (citing *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997)).

*1. The Manner in Which Police Summoned the Suspect for Questioning.*

The defendant argues that "just because an interrogation occurs in a suspect's home does not mean the interrogation could never be regarded as 'custodial.'" *Lee v. State*, 988 So. 2d 52, 54 (Fla 1st DCA 2008). We agree, but "the location of the interview is a factor that supports a trial court's conclusion that the defendant is not in custody." *Bannister*, 132 So. 3d at 276 (quoting *Snead v. State*, 913 So. 2d 724, 726 (Fla. 5th DCA 2005)).

"In those instances where an in-home interrogation was found to have escalated past the level of 'custodial,' the interviewing officers typically either exhibited an overwhelming show of authority or confronted the defendant with contraband so indicative of guilt that a suspect would feel there is enough evidence to be arrested." *Bannister*, 132 So. 3d at 276.

5

Here, the trial court found:

> The first and second factors for consideration under *Ramirez* are closely related. In this case, the manner in which [the [d]efendant was summoned for the interview, and the place and manner of the interview, are significant. [The FL detective] met [d]efendant at her aunt's home. The [d]efendant was initially asked if she would be willing to go with [the Florida detective] to the local police station to talk. She was immediately told that she was not under arrest and would be free to return.
>
> The [d]efendant chose not to leave her aunt's home and there was no pressure placed on her to leave with law enforcement. Thereafter, the entire interview occurred in the [d]efendant's home. Moreover, the [d]efendant's cousin was present during the entire interview.
>
> It is clear that the place and manner of the interview here would not lead a reasonable person to conclude that their freedom was curtailed to a degree associated with an arrest. The [d]efendant was interviewed in the presence of relatives in the safe environment of a family member's home. She exercised the free choice not to leave that home.

The record supports those findings. The case law supports the trial court's conclusion.

The Florida detective traveled to Maryland to meet the defendant at her aunt's house. The Maryland police surveilled the aunt's house for nearly eleven hours and impounded the defendant's car, but no one was stopped coming or going from the house during the surveillance. When the defendant refused to go to the police station, the detective agreed to interview her at the house. He advised her multiple times that she was **not** under arrest and never handcuffed her. The defendant agreed to speak with the Florida detective. And, when the interview was over, the Florida detective left the home thanking the defendant for speaking with him.

Nevertheless, the defendant argues a reasonable person would not have felt she was at liberty to terminate the interrogation and leave because the police deprived her of her means of transportation and kept a constant eye on her all day. She cites to *Myers v. State,* 211 So. 3d 962 (Fla. 2017), *Lee,*

6

988 So. 2d at 54, and *Killian v. State*, 761 So. 2d 1210 (Fla. 2d DCA 2000), in support.

In *Myers*, law enforcement aggressively interrogated the defendant on two separate occasions, threatened him, called him a liar, and cursed him out at the police station. 211 So. 3d at 966. In *Lee*, a 17-year old did not feel free to leave after his parents were asked to leave the room so that law enforcement could question him alone and the officer continuously accused him of the crime, which he denied. 988 So. 2d at 54. In *Killian*, the defendant did not feel free to leave because the detective told him to wait outside his house while they executed a search warrant and law enforcement kept an eye on him. 761 So. 2d at 1211–12. The trial court rightfully distinguished these cases from the unobtrusive and passive surveillance by the unmarked cars and towing of the defendant's vehicle.

We understand the defendant's suggestion that she did not feel free to terminate the encounter because the Florida detective said she was not going to be given an opportunity to speak to an attorney. However, her subjective feelings do not dictate the result. We are required to determine whether "a reasonable person placed in the same position would believe that his or her freedom of action was curtailed **to a degree associated with actual arrest**." *Ramirez*, 739 So. 2d at 573 (emphasis added).

We cannot say the defendant was summoned in a manner that would lead a reasonable person to feel detained "to a degree associated with actual arrest." *See id.*

*2. The Purpose, Place, and Manner of the Interrogation.*

In *State v. Figueroa*, the Fifth District held the defendant was not in custody for *Miranda* purposes because the interview occurred at the defendant's house around the dining room table and detectives did not coerce or intimidate him. 139 So. 3d 365, 368 (Fla. 5th DCA 2014). There, the detectives testified the defendant could have left the dining room at any time because his egress was not blocked, he was not handcuffed, and he was not under arrest. *Id.* at 367.

Here, the defendant's 34-minute interview took place in her aunt's house at the kitchen table in the presence of her cousins. She was not handcuffed or prevented from leaving the table. The Florida detective did not intimidate the defendant or make physical threats. In fact, after the interview, the defendant expressed that she felt "very comfortable" speaking with the detective.

7

After the defendant told the Florida detective she killed the victim because "he said he didn't actually love [her]," he asked for more specifics; such as, where she got the knife and if she remembered what she wore. When the detective asked her to "just describe [the shirt] for me," the defendant responded: "I can just (inaudible) if you want," and voluntarily handed him the shirt she had worn. *See Duddles v. State*, 845 So. 2d 939, 941 (Fla. 5th DCA 2003) (finding that although the detective informed the defendant of allegations against him, the detective asked defendant for his side of the story and did not use coercion, intimidation, or trickery).

Here, the aunt's house, the conversational tone of the interview, and the fact that they sat around the kitchen table with the defendant's cousins nearby weigh in favor of the State.

3. *The Extent to Which the Defendant Was Confronted with Evidence of Guilt.*

The trial court found the Florida detective did not confront the defendant during the interview with inconsistences in her statement because she was forthright in describing what happened. The court further found the Florida detective did not confront the defendant with evidence. Even if the defendant had been confronted with evidence, this does not turn a consensual encounter into a custodial interrogation. *See Figueroa*, 139 So. 3d at 368–69.

The Florida detective told the defendant he knew a lot about what happened and "people (inaudible) the house the other night in your car." He also stated, "this is your opportunity' cause right now it's coming out that . . . basically, everything shows that you just drove over there with the intention of killing [the victim] which is really bad."

The Florida detective asked open-ended questions about what happened that night, to which the defendant replied, "you know what he said?" The interview was conversational, rather than confrontational. This factor also weighs in favor of the State.

The Florida detective advised the defendant of some of the evidence, but she responded by conversing with the Florida detective, admitting her guilt, and providing him with the shirt she wore that evening. She was not confronted with inconsistencies or evidence in such a manner that would cause a person to feel their freedom was restrained to the extent of a formal arrest.

*4. Whether the Suspect is Informed that She Was Free to Leave the Place of Questioning.*

The trial court reasoned the "[d]efendant was questioned in her aunt's house." She was told up front that she was not being arrested and that the Florida detective would return to Florida. While the Florida detective did not tell the defendant she was free to leave, he told her that she was not under arrest multiple times. The Florida detective also told her he was going to leave the house and gave her his business card. He thanked the defendant for talking to him, thanked her cousin for letting him in, and left after the interview. The defendant stayed in the house, while the defendant's cousin continued to speak with the detective outside.

We cannot say that a reasonable person placed in the same position as the defendant would not feel free to leave the place of questioning.

Based on the totality of the circumstances, the four *Ramirez* factors, and case law, this was, as the trial court found, not a "custodial" interrogation. Without a custodial interrogation, the defendant was not entitled to *Miranda* warnings or an attorney.

*Affirmed.*

WARNER, J., and HILAL, JENNIFER, Associate Judge, concur.

*      *      *

**Not final until disposition of timely filed motion for rehearing.**

9