DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**TERRENCE MATHIS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2024-1543

[April 8, 2026]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Bernard Isaac Bober, Judge; L.T. Case No. 062017CF010225A88810.

Daniel Eisinger, Public Defender, and Mara Catherine Herbert, Assistant Public Defender, West Palm Beach, for appellant.

James Uthmeier, Attorney General, Tallahassee, and Jessenia J. Concepcion, Assistant Attorney General, West Palm Beach, for appellee.

FORST, J.

Appellant Terrence Mathis appeals his conviction and life sentence for second-degree murder. Mathis argues that (I) the trial evidence was legally insufficient to sustain his conviction and failed to support the jury instruction on "Principals," and (II) the prison releasee reoffender ("PRR") statute is unconstitutional. We affirm on issue II without discussion and affirm on issue I because the evidence was sufficient to sustain Mathis's conviction and supported the jury instruction on "Principals."

**Background**

*The Trial Evidence*

The victim was found deceased in the driver's seat of his van, which was parked outside his Lighthouse Point condominium. The victim sustained two gunshot wounds to the head and neck.

The police located two spent casings near the victim's van, each bearing a unique marking (star-dash-star).  Two law enforcement officers with a combined twenty-four years' crime scene processing experience testified they had never seen ammunition with this unique marking before.

As the investigation narrowed in on Mathis as a potential suspect, police searched Mathis's residence.  After emptying a hamper of dirty clothes located in one of the bedrooms, which contained mail addressed to Mathis, an officer located a live round bearing the same unique star-dash-star marking.

The live round was tested for DNA, which originated from a single contributor, and the results were consistent with Mathis's profile.  In fact, the testifying forensic scientist explained that the chance of selecting a random unrelated individual from the general population with that profile is rarer than 1 in 400 billion.

While no firearm was recovered, a firearms analyst testified that the two spent casings and the live round all shared common "manufacturing marks," which suggested a common manufacturing origin.  Additionally, one of the spent casings and the live round shared marks consistent with "lip marks."  While the firearms analyst could not state with certainty that a firearm created these marks, she confirmed these marks could be created when a live round is loaded into a magazine.

The victim was found deceased in the early morning hours.  Mere hours before his death, the victim was seen on surveillance footage at the liquor store that he managed, and then shopping at a Walmart located near his condominium.  This Walmart is in the opposite direction of Mathis's Miami Gardens residence in relation to the liquor store.

The liquor store surveillance footage, which was admitted into evidence, showed Mathis exiting his car's driver's seat, entering the liquor store, walking past the victim, purchasing a bottle of liquor, and then reentering the driver's seat.  The footage showed Mathis's car circling the liquor store parking lot and then following behind the victim's van once it leaves.  The Walmart footage, also admitted into evidence, revealed a similar pattern.  As the victim shopped for groceries, Mathis's car circled the Walmart parking lot and then backed into a parking space.  After the victim returned to his van, which then exited the Walmart parking lot, Mathis's car exited the Walmart parking lot.

A testifying digital forensics witness analyzed the victim's and Mathis's cell phones, which revealed that "there were numerous locations, about

2

four of them that were very consistent in time on both of the phones." These locations were in a commercial area not far from this Walmart location.

License plate readers in the city of Lighthouse Point captured Mathis's car following behind the victim's van in the early morning hours as the victim's van was driving towards the victim's condominium. Two other license plate readers subsequently captured Mathis's car leaving Lighthouse Point in the same timeframe that a condominium neighbor reported hearing "bangs" nearby. Mathis's car was in Lighthouse Point for six minutes, and the license plate reader database indicated that Mathis's car had never been in Lighthouse Point before.

Data from Mathis's phone revealed that the phone traveled southward through Hollywood and then was located in Miami Gardens when police initially responded to the Lighthouse Point homicide scene. Additionally, in the early morning hours, Mathis's phone reflected several Google searches, including "Pompano news," "man found dead in Pompano," and "cost to change license plate." Some of these searches occurred before police had responded to the homicide scene, and Mathis's phone continued to reflect similar searches throughout the day.

During the investigation, Mathis spoke with a detective, and this detective testified about his conversation with Mathis. **The detective testified that Mathis confirmed he had been driving his car, no one had borrowed his car, and Mathis had his phone in his possession that night.** The detective also showed Mathis the liquor store footage. According to the detective, Mathis verified he was at the liquor store and indicated that he did not know the victim, but recognized him from the liquor store.

At one point, the liquor store footage showed a person entering the passenger side of Mathis's car, but the camera is too far away to tell who this person was. The victim's van passed the camera in the foreground around the same time. When the detective asked Mathis who had entered his car, Mathis responded that it was "either a prostitute or the pimp" because he had been in the area seeking a prostitute. The detective testified that when he confronted Mathis with the Lighthouse Point license plate readers data, Mathis denied being in Lighthouse Point and could not provide a reason for his car being there.

Mathis's trial strategy largely focused on pinning the homicide on his brother, whom his counsel called "the real shooter." While cross-examining the detective, Mathis's counsel asked the detective whether he

3

knew if Mathis's brother was or was not at the liquor store on the night of the murder, and the detective responded, "I don't know for a fact, no."

Mathis testified in his own defense. Mathis claimed that he and his brother were at the liquor store, drove to a nearby parking lot where they "hung out" for five to ten minutes, and then they ended up "kicking it" in an alleyway with a friend (who Mathis explained was "a pimp") and two women whom Mathis believed were prostitutes. Mathis contended that his brother then left in Mathis's car for about an hour, purportedly to go and see the brother's "baby mama"—leaving Mathis behind (with the friend and two women), without his phone, which he claimed was in his car charging the whole time.

During the nearly three-hour window encompassing the timestamps on the liquor store footage, Walmart footage, and Lighthouse Point license plate readers, Mathis's phone was "unlocked" nineteen times. Mathis's phone required a passcode or a thumbprint for access. Mathis testified that when his brother returned, Mathis was "completely out of it" due to having mixed prescription Percocet with beer and liquor. When pressed for details about what happened after his brother had returned in Mathis's car, including if anyone was with him, Mathis testified, "I'm not sure. I'm not sure. I -- I don't even remember really, like getting in the car when he came back." Mathis testified that he woke up in his car's back seat as his car was on the expressway headed towards Miami Gardens. Mathis further recalled a conversation in which his brother stated he "got into something up there in Broward County" and "you might have to change your license plate or even burn the car." Mathis recalled that his brother mentioned "Pompano," which Mathis claimed prompted him to make various searches on his phone about Pompano-related news.

*"Principals," Closing Arguments, and Verdict*

A grand jury indicted Mathis for first degree murder with a firearm. The charge included "Principals" theory language: "or intentionally aiding another person as a principal to such shooting." The prosecutor and Mathis's counsel also discussed "Principals" theory during voir dire with the use of a hypothetical.

During the charge conference, the trial court stated, "[a]nd 3.5(a) Principals, seems to be standard for that." Mathis's counsel answered,

4

"Seems correct.  Yes.  Exactly standard."[1]  Later, the trial court asked the attorneys to review the final instructions, to which Mathis's counsel responded, "Looks good, Judge."

During closing argument, the prosecutor primarily argued that Mathis was the shooter.  However, the prosecutor also explained how providing the car or the ammunition could support the "Principals" theory.  During the defense's closing argument, Mathis's counsel at one point stated, "[t]here is no direct evidence whatsoever in this case that Mr. Mathis killed [the victim].  There is circumstantial evidence that suggests he may have been involved.  And what we tried to present to you is evidence to show you that there -- that cuts both ways."

The jury found Mathis guilty of second-degree murder, a lesser-included offense for the charged first-degree murder.  The jury answered "no" to the verdict form's questions of whether Mathis actually possessed a firearm, discharged a firearm, and actually inflicted death to the victim as a result of discharging a firearm in his possession.  This appeal follows.

## Analysis

"The test for the legal sufficiency of the evidence 'is simply whether the State presented competent, substantial evidence to support the verdict.'" *Alford v. State*, 413 So. 3d 132, 139 (Fla. 4th DCA 2025) (quoting *Bush v. State*, 295 So. 3d 179, 200 (Fla. 2020)).  "All conflicts in the evidence and all reasonable inferences therefrom must be resolved in favor of the verdict on appeal."  *Id.*

"A trial court's decision regarding jury instructions is reviewed under the abuse of discretion standard."  *Terrien v. State*, 94 So. 3d 648, 649

---

[1] "If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if:

1.  the defendant had a conscious intent that the criminal act be done;

    and

2.  the defendant did some act or said some word that was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.

To be a principal, the defendant does not have to be present when the crime is committed or attempted."  Fla. Std. Jury Instr. (Crim.) 3.5(a).

(Fla. 4th DCA 2012) (citation omitted). Because Mathis's counsel failed to contemporaneously object to the "Principals" jury instruction, we review for fundamental error under a de novo standard of review. *See id.*

"Section 777.011, Florida Statutes, provides that a principal in the first degree is one who 'commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed.'" *Salter v. State*, 77 So. 3d 760, 763 (Fla. 4th DCA 2011) (quoting § 777.011, Fla. Stat. (2009)). "To convict under a principals theory, the State is required to prove that: (1) 'the defendant had a conscious intent that the criminal act be done'; and (2) 'the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.'" *Farris v. State*, 406 So. 3d 951, 957 (Fla. 4th DCA 2025) (quoting *Hall v. State*, 100 So. 3d 288, 289 (Fla. 4th DCA 2012)). "The elements of aiding and abetting—assisting the actual perpetrator in some way and intent to participate—'may be proven by a combination of surrounding circumstances from which a jury can reasonably infer a defendant's guilt.'" *Salter*, 77 So. 3d at 763 (quoting *Parker v. State*, 795 So. 2d 1096, 1099 (Fla. 4th DCA 2001)).

Here, ample evidence exists from which the jury could infer that Mathis had a conscious intent for another person to shoot the victim unjustifiably, and that Mathis did some act which was intended to assist that other person. *See Farris*, 406 So. 3d at 958 ("To convict a defendant of second-degree murder, 'it is not necessary for the State to prove the defendant had an intent to cause death.'" (quoting Fla. Std. Jury. Instr. (Crim.) 7.4)).

*The Evidence Implicating Mathis*

The two spent casings recovered from the homicide scene had the same unique star-dash-star marking as a live round found in a room in Mathis's residence. The DNA on the live round originated from a *single* contributor consistent with Mathis's profile and the chance of selecting a random unrelated individual from the general population with that profile is rarer than 1 in 400 billion. Testimony also indicated commonalities in the markings on the spent casings and the live round.

The liquor store surveillance footage placed Mathis at the liquor store that the victim managed mere hours before the victim was found dead, and Mathis can be seen exiting and reentering the driver's seat of his car. The admitted surveillance footage shows this car circling two parking lots,

appearing to wait for the victim as he worked and shopped. License plate readers tracked this very car following the victim's van into Lighthouse Point—a city which Mathis's car had never entered before and in the *opposite* direction of Mathis's Miami Gardens residence. The license plate readers registered Mathis's car leaving Lighthouse Point in the same timeframe that a condominium neighbor had reported hearing "bangs."

Cell phone data placed Mathis's phone and the victim's phone in close proximity in the early morning hours. Moreover, Mathis's phone made several incriminating searches about Pompano-related news of a shooting and the cost to change a license plate, with some of these searches occurring *before* police had initially responded to the Lighthouse Point homicide scene. Mathis's phone had also been "unlocked" nineteen times over a three-hour period encompassing the liquor store, Walmart, and Lighthouse Point timestamps, which is inconsistent with Mathis's claim that his phone was passively left on a charger as his brother left in Mathis's car.

Mathis's defense theory revolved around identifying his brother as "the real shooter." To advance this theory, Mathis placed himself with his brother in the time period leading up to and after the homicide and claimed that he had lent his brother his car, leaving Mathis behind in an alleyway, without a phone, for approximately an hour. Yet, the State proffered testimonial evidence that Mathis initially told a detective that no one had borrowed Mathis's car on the night of the murder. The jury had the benefit of considering Mathis's testimony, and "the jury was free to accept those portions of the defendant's testimony or statement that it found worthy of belief, and it was likewise permitted to reject those portions of the defendant's testimony that were not." *See Hampton v. State,* 103 So. 3d 98, 119 (Fla. 2012). Also, Mathis's counsel posed questions to witnesses in a manner which left open the possibility that the brother may have been responsible for the homicide, or the possibility that additional occupants may have been in Mathis's car.

The trial court did not abuse its discretion in giving the "Principals" instruction based on the trial evidence and Mathis's theory of the case. *See Senser v. State,* 243 So. 3d 1003, 1011 (Fla. 4th DCA 2018) (holding that the trial court did not abuse its discretion in giving the "Principals" instruction because "through his evidence and questioning of various witnesses, Appellant advanced a theory that there was another person involved in the Victim's death").

We also note that both the prosecutor and Mathis's counsel were well aware that a "Principals" argument could come into play even before trial

was underway.  The grand jury indictment included "Principals" language, and both the prosecutor and Mathis's counsel discussed "Principals" with the venire panel with the aid of a hypothetical.  *See Thomas v. State*, 617 So. 2d 1128, 1128 (Fla. 3d DCA 1993) ("The state's information charged the defendant under the principal theory.  The state's questioning, as well as the defendant's cross-examination, reflect that both parties were aware of this theory.  The proper charge to be given to the jury rested in the sound discretion of the trial judge and no abuse was demonstrated in the court's decision to give the jury the principal instruction.").

## Conclusion

Because no error, let alone fundamental error, occurred when the trial court gave the "Principals" instruction, and the evidence is sufficient to sustain Mathis's conviction for second-degree murder, we affirm Mathis's conviction and life sentence.

*Affirmed.*

KLINGENSMITH and SHEPHERD, JJ., concur.

*       *       *

***Not final until disposition of timely-filed motion for rehearing.***